The People of the State of New York, Respondent, v Anthony Loewel, Appellant.

Fourth Department, January 16, 1976

*Herald Price Fahringer (Paul Cambria* of counsel), for appellant.

*Robert J. Sullivan, District Attorney (John Ward, Jr.,* of counsel), for respondent.

GOLDMAN, J. Defendant appeals from a judgment of Chautauqua County Court, ADAMS, J., convicting him of attempted criminal possession of stolen property in the first degree and attempted criminal possession of a weapon in the third degree. The convictions were entered upon pleas to two indictments, following denials of motions to suppress evidence, in full satisfaction of other outstanding indictments.

(A) ATTEMPTED POSSESSION OF STOLEN PROPERTY.

The first indictment was based upon the seizure of stolen coins under a warrant which authorized the search of the basement of a house, owned but not occupied by appellant, for "coins * * * removed from the premises of Ralph Jones and nine suitcases in which they are contained".

The application for the warrant was supported by two affidavits, one by Jamestown police officer Richard D. Ream, the other by New York State police investigator David L. Carr.[1] Ream's affidavit, bearing the same date as the warrant, stated: (1) that a reliable informant had advised him that coins taken by appellant "are located in a two and a half story frame dwelling owned by [appellant] on * * * Linquist Drive in the Town of Poland"; (2) that the informant stated "that [appellant] had been to the house of Ralph Jones * * * to work on a couple of his appliances located in the cellar next to the vault and that [appellant's] mode of operation is to case a place and then wait approximately a year and a half before hitting it"; (3) that the information was based on "the infor-

---

1. A third affidavit, sworn by one Paul Donner, was also submitted but was not considered by County Court in upholding the warrant. We agree that the Donner affidavit was irrelevant.

mant's personal knowledge and direct observation"; (4) that Ream knew the informant to be reliable "because he has given information leading to the arrest and conviction of two individuals involved in narcotics". Ream made further disclosures *in camera* which established the informant's reliability.

The affidavit of Inspector Carr, also bearing the same date as the warrant, alleged that appellant, on February 12, 1974, had tried to sell a coin collection to an underground police investigator named Wolthe. In his conversation with Wolthe, which was recorded on tape, appellant said that the coins "were in nine suitcases" and "buried". Independent investigation, Carr alleged, showed that none of the stolen coins had come to market since appellant and Wolthe talked. Carr's own investigation showed that appellant worked for an appliance company and had been to Ralph Jones' home on August 17, 1972 "to check appliances * * * located in the basement next to the vault room where the coins were kept". The coin burglary, Carr stated, occurred on or about October 12, 1973. Carr alleged that "the premises have been kept under surveillance since the informant advised us of the probable location of the coins", but Carr, like Ream, failed to say when the informant's information was received. Carr referred to Ream's affidavit for "information that [appellant] has the coins" in the Lindquist Drive house. Carr stated that further investigation showed that the first and second floors of the house were rented to tenants and "not under the control of the defendant". The warrant, issued February 27, 1974 and executed the same day, authorized New York State police to search "the cellar, beneath the floor of the cellar, behind the walls of the cellar" of appellant's Lindquist Drive house.

Appellant contends that County Court erred in denying his motion to suppress the coins seized in the search, because the warrant was issued upon an insufficient showing of probable cause.

When an affidavit in support of a warrant relies on hearsay information supplied by an informer, the affidavit must show "(1) whether the informant is in fact reliable, and (2) whether the underlying circumstances as to how the informant came by his information demonstrates sufficient probability of credibility to allow the search of the premises * * * in question" *(People v Hendricks,* 25 NY2d 129, 133, citing *Aguilar v Texas,* 378 US 108, and *Spinelli v United States,* 393 US 410). Appellant concedes that *in camera* disclosures satisfied the

first requirement, but urges that the second requirement was not met. The Ream affidavit simply states that the information was supplied "on the informant's personal knowledge and direct observation", and gives no details regarding what the informant saw and how he otherwise learned what he knew. For that reason the Ream affidavit was, as County Court concluded, insufficient by itself to demonstrate the reliability of the informant's information.

Corroboration supplied by a police officer's independent investigation can establish the credibility of an informant's information *(People v Hendricks,* supra, p 134), and the Carr affidavit did corroborate some, though not all, of the important elements of the informant's story. Carr's personal investigation, disclosing that appellant worked on appliances near Jones' coin vault on August 17, 1972, closely corroborates the informant's account of how appellant "cased" the premises. The fact of the delay of almost 14 months between appellant's visit and the burglary jibes reasonably well with the informant's description of appellant's mode of operation. Appellant's own words, recorded on tape some 15 days before the warrant was issued, leave little doubt that he knew of a coin collection buried in suitcases somewhere and that he was trying to sell it. However, the corroboration going specifically to the question of whether the coins were in the house is very weak. Carr verified that appellant owned the house and he implied that he had control of the basement. That merely suggests that it was feasible for him to hide the coins there, but falls far short of showing that he actually did so, especially since he lived elsewhere. Carr's allegation that the house had been watched since the receipt of the informant's story, although it suggests that no coins were removed during that indefinite time span, supports no inference that the coins were ever in the house.

As it happens, we need not decide whether Carr's corroboration adequately assured that the informant's facts were accurate when gathered. Even if they were, we would still be constrained to hold this warrant invalid. The reason is that the affidavits utterly fail to show that the information is current (cf. *Sgro v United States,* 287 US 206). The Ream affidavit simply states that the coins "are located" in the house. It does not indicate when the informant learned his facts or when he communicated them. A similar situation was presented in *Rosencranz v United States* (356 F2d 310). There,

according to the affidavit, an anonymous informant had stated that illegal whiskey and materials for its manufacture "are now being held on said premises", and the affiant himself had detected "a strong odor of mash outside the premises". The affidavit did not give the date of the informant's information or of the affiant's own observations. The court, in holding the warrant invalid, stated (pp 316–317): "The present tense is suspended in the air; it has no point of reference. It speaks, after all, of the time when an anonymous informant conveyed information to the officer, which could have been a day, a week, or months before the date of the affidavit. To [uphold the warrant] * * * would be to open the door to the unsupervised issuance of search warrants on the basis of aging information. Officers with information of questionable recency could escape embarrassment by simply omitting averments as to time * * *. Magistrates would have less opportunity to perform their 'natural and detached' function. Indeed, if the affidavit in this case be adjudged valid, it is difficult to see how any function but that of a rubber stamp remains for them."

The Ream affidavit, reporting the informant's information, was dated February 27, 1974. According to Carr's affidavit, the burglary occurred on October 12, 1973. Thus the information placing the coins in the house could have been as much as four and a-half months old, and the affidavits "failed to negate the possibility that the information was 'stale'" *(People v Kramer,* 38 Misc 2d 889, 891).[2] The affidavits were not "bolstered by the detailed independent and confirmatory observations of the police officers themselves made as recently as the day before the warrant issued", as was the case in *People v Brandon* (38 NY2d 814, 815, decided Dec. 29, 1975) where the

---

2. CPL 690.30 requires that a search warrant be executed within 10 days of issuance. Although there is no parallel provision limiting the time for showing proof of probable cause to the magistrate, it is "manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time" *(Sgro v United States,* 287 US 206, 210).

Because the rate at which probable cause becomes stale can vary with the circumstances of the particular case, it would be unwise to fix any arbitrary deadline *(Durham v United States,* 403 F2d 190, 194, n 6; *Schoeneman v United States,* 317 F2d 173, 177.) Nevertheless, some practical limits can be gleaned from the cases. It has been stated that "an interval of less than 4 days has never been held so unreasonable as to vitiate a search warrant, while, on the other hand, an interval of more than 49 days has always been held an unreasonably long delay (Ann 100 ALR2d 525, 534, n 12, Search Warrant: sufficiency of showing as to time of occurrence of facts relied on). See *People v Mercado* (45 AD2d 699); *People v Beshany* (43 Misc 2d 521, 529–530).

Court of Appeals held that the warrant withstood the attack on its issuance even though the affidavits did not contain specific dates. Appellant's statement on February 12, 1974 that the coins were "buried" does not cure the defect, because it does not corroborate the informant's statement that the coins were in the house.

We stop short of holding that affidavits in support of a search warrant are per se insufficient if they lack specific time averments. An affidavit that fails to mention times or dates might nonetheless set forth other facts and circumstances which make it obvious that the information is fresh. The present affidavits, however, give no such indication.

The People urge that a Magistrate could properly assume that a "reliable" informant would not delay unreasonably in giving his information to the police. To repose such blind confidence in an anonymous informer would only subvert the purpose of the warrant procedure, which is to subject the facts claimed to show probable cause to the "informed and deliberate" scrutiny of a "neutral and detached" magistrate *(Aguilar v Texas,* 378 US 108, 110–111, *supra).* The burden of showing that the informant's facts were fresh would have been minimal, and the affiant's failure to make such a showing should not have been excused.

Accordingly, the items seized in the search of appellant's cellar should be suppressed and the cause remanded for further proceedings upon the indictment for criminal possession of stolen property.

(B) ATTEMPTED CRIMINAL POSSESSION OF A WEAPON.

The second indictment was based on the seizure from appellant's coat pocket of a .38 caliber revolver, incident to his warrantless arrest on October 29, 1974, at the A & A Tire Store in Jamestown, New York. Appellant's motion to suppress the gun was denied after a hearing.

Inspector David Carr, attached to the New York State Police Bureau of Criminal Investigation, testified at the suppression hearing that only a part of Ralph Jones' coin collection had been recovered in the search of appellant's cellar, and that the Bureau was co-operating with other police agencies in an effort to recover the still-missing coins. From descriptions supplied by Jones, the Bureau was aware that some of the coins were in cardboard holders bearing the name, "Ralph C. Jones". Carr identified coins, and 8 suitcases that contained them, which were recovered at the A & A Tire

Store on October 29, 1974, some 8 months after the search of appellant's cellar, and just prior to appellant's arrest.

Earlier on the afternoon of the tire store arrest, FBI agent Leo Connolly, posing as a party interested in buying the coins, had been introduced to one Albert Traniello, a co-owner of the A & A Tire Store, who accompanied him there to view the coins. En route, Traniello explained that the coins had been stolen by a young man whom he described as "a good friend, and an excellent burglar, who had previously been arrested by a police agency". The same friend had set up the display of coins which Connolly was to view. After they arrived at the tire store, Connolly and Traniello proceeded to Traniello's office, which was adjoined by a small padlocked room. Upon displaying an $80,000 check, Connolly was allowed into the back room and saw that it was filled with "coins in various stages of display", some of which were in cardboard holders bearing the name "Ralph Jones". After viewing the coins, Connolly returned to his car and got a magnifying glass and some coin books. That, he explained, was a prearranged signal to officers watching outside "that I had observed coins that I believed to be from the Ralph Jones collection". Then Connolly returned to the back room and arrested Traniello.

New York State Police Investigator Donald J. Munch, at whose direction appellant was arrested at the tire store, was a member of the surveillance team outside. After seeing Connolly and Traniello arrive and enter the building, he saw Connolly come out and get a magnifying glass and coin books, which meant to him "that the coins were inside the building, and a deal was about to be consummated" and that he was to wait about a minute before entering. When Munch entered the premises he saw and recognized appellant leaning against a truck some 30 to 40 feet from the office entrance. He continued to the office and into the back room, where he saw the coins. It was "very visible that they belonged to Ralph Jones", because a number of the cases bore his name. Upon seeing the coins, Munch "immediately" turned to State Police Investigator Terrance D. Fiegl, who was behind him, told Fiegl that appellant was out by the truck, and ordered him to "go get him and place him under arrest".

Fiegl testified that he had accompanied Munch into the building and had seen appellant, whom he knew only from pictures, standing by the truck. Fiegl stated that he knew that appellant "had been involved in some activity with coins", but

he was not permitted to go into detail. As Munch entered the back room, with Fiegl close behind, Fiegl "observed the suitcase of coins from the doorway", whereupon Munch told him to arrest appellant. Fiegl, who was dressed "casually", walked up to appellant, who was still standing by the truck, and said: "State police, you are under arrest, I want you in the back room". Fiegl grabbed appellant's right arm, and then appellant said, "I don't know who you are, I am not going anywhere with you". Appellant then pulled away and "raised his right hand just about to his head with the palm flat", whereupon Fiegl repeated, "I'm state police, I want you in the back room". Then Fiegl exposed his service revolver and placed his hand on the butt of it and appellant "broke away and started running". As he was running, "his hand was going to his side", so Fiegl drew his revolver because he thought appellant "might be armed". Then two FBI agents, at least one with his gun drawn, ran out from behind the truck, and Fiegl holstered his gun and grabbed appellant. Appellant kept resisting and saying that he did not know who Fiegl was, and Fiegl took out his identification and displayed it. Then Fiegl and the two FBI agents subdued appellant, took him into the tire store, frisked him and handcuffed him. They found a loaded .38 caliber revolver in his right coat pocket. Later, Loewel asked what he was arrested for and, in Fiegl's words, "I told him, for one thing, the possession of a weapon, and I think Senior Investigator Munch advised him, for the coins also".

Appellant testified that Fiegl, whom he did not know, approached him, grabbed his right arm and said "Come with me, I'm state police". Appellant pulled away and asked to see identification, which was not shown. Fiegl grabbed him a second time, and as he was trying to pull away, the other two officers arrived. Appellant denied that he made any motions towards his pockets during the encounter with Fiegl.

Since the search of appellant's person and the seizure of the revolver were without a warrant and without his consent, they can be justified only if incident to a lawful arrest *(People v Malinsky,* 15 NY2d 86, 91). The warrantless arrest was lawful only if the police had reasonable cause to believe that appellant had committed a crime (CPL 140.10, subd 1, par [b]). Reasonable, or probable, cause has been defined as " 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable cau-

tion in the belief that' an offense has been or is being committed." *(Brinegar v United States,* 338 US 160, 175-176.)

The police did not, at the moment of arrest, have probable cause to believe that appellant possessed a weapon. It was never in plain view and was not found until after he was subdued at gun point and searched. Nor could appellant's hand gestures supply probable cause, even assuming that they were more than merely "equivocal and suspicious" *(People v Corrado,* 22 NY2d 308, 311), because they occurred only after Fiegl had arrested appellant and physically grabbed him. Prior to that time, by Fiegl's own account, appellant was simply standing and doing nothing unusual. The police did, however, have reasonable cause to arrest appellant as a party to the possession of the stolen coins. Investigator Munch, before being stopped by an objection, indicated that he knew "the nature, the extent, the suspects involved" in the Jones burglary and that he knew appellant at the time of the arrest, because he was "very familiar with the arrest, a couple of months after the initial burglary of the Jones residence * * * and the recovery of certain items at the time". Fiegl, who was acting at Munch's direction when he arrested appellant, also knew that he "had been involved in some activity with coins". Hence, when Munch observed the coins and found it "very visible that they belonged to Ralph Jones" it was reasonable for him to conclude, as County Court did, that it was not "mere coincidence that a man who had had a portion of the stolen collection was standing by when $80,000 was being paid for the balance". Since Fiegl acted at the direction of Munch, who knew facts sufficient to establish probable cause to order appellant's arrest (cf. *People v White,* 16 NY2d 270), it was not necessary for Fiegl himself to possess information amounting to probable cause *(People v Horowitz,* 21 NY2d 55, 60; *People v Smith,* 31 AD2d 863, 864; cf. *People v Floyd,* 56 Misc 2d 373, 376–377; *United States v Robinson,* 354 F2d 109 [2d Cir en banc], cert den 384 US 1024).

It is possible that some of Munch's information connecting appellant with the coins was derived from the illegal search of his cellar. Appellant had ample opportunity to litigate the question of whether his arrest and the seizure of the revolver were "fruits" of the prior illegal search. This issue was neither raised nor litigated at the suppression hearing. Furthermore, appellant has not presented on this appeal the effect of the illegality of the seizure of the coins at appellant's house

and its relationship to the weapon possession indictment. Inasmuch as this aspect of the case is not before us, we intimate no view on the possible application of the derivative evidence rule to the present facts. Under the circumstances, we conclude that the revolver was seized in a search incident to a lawful arrest. The motion to suppress the weapon was properly denied and the conviction should be affirmed.

MOULE, J. P., CARDAMONE, MAHONEY and WITMER, JJ., concur.

Judgment insofar as it convicts defendant of the crime of attempted possession of stolen property, first degree, unanimously reversed on the law and facts, motion to suppress granted, and case remitted to Chautauqua County Court for further proceedings upon indictment No. 74-38, as amended, and otherwise judgment affirmed.