■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT JACKSON, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Queens County, rendered November 20, 1975, convicting him of robbery in the third degree, upon a jury verdict, and imposing sentence. By order dated January 31, 1977, this court reversed the judgment and dismissed the indictment (People v Jackson, 55 AD2d 961). By order dated June 15, 1978, the Court of Appeals reversed the aforesaid order of this court, and remitted the case to this court for a review of the facts. Judgment affirmed. The crucial question is whether the evidence sustains the jury's verdict that the defendant was guilty of being an accomplice to the robbery by reason of his knowing participation as the driver of the getaway car (see Penal Law, § 20.00). In our opinion, there was ample evidence to sustain the jury's determination that the defendant was a knowing accomplice. The evidence established that the codefendants were seen entering the defendant's vehicle; that the defendant stopped the car in the vicinity of the purse snatching; that codefendant McMillan exited the car and shortly thereafter snatched a pocketbook from the complainant; that as he was fleeing, codefendant Walker came upon the scene and fired a shot at a man who was chasing McMillan; that after the codefendants entered the car, the defendant immediately drove off and the codefendants promptly crouched down low in the back seat; that when the car was stopped by the police, the victim's wallet and a loaded gun from which one shot had been fired were found on the front seat; and that the pocketbook was found jammed under the front seat. In view of the foregoing, the jury's verdict was not against the weight of the evidence. Hopkins, J. P., Martuscello, Damiani and Cohalan, JJ., concur.

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT JACKSON, Appellant.—Appeal by defendant from a judgment of the County Court, Nassau County, rendered February 10, 1977, convicting him of attempted criminal possession of a weapon in the third degree, upon his plea of guilty, and imposing sentence. The appeal also brings up for review the denial, after a hearing, of defendant's motion to suppress physical evidence and a statement made by him. Judgment reversed, on the law and the facts, motion to suppress granted, indictment dismissed and case remitted to the County Court, Nassau County, for the purpose of entering an order in its discretion pursuant to CPL 160.50. In our opinion, the testimony of Police Officer Holmes with respect to events leading up to the arrest of the defendant for possession of a firearm and the seizure of the subject weapon was so incredible and at times so inconsistent and contradictory as to mandate the suppression of such physical evidence. According to Holmes' initial direct testimony at the suppression hearing, at approximately 12:05 A.M. on January 5, 1976, he and his partner responded to a radio call and were directed to an address in Manhasset. When they arrived at the address, a Mrs. Wilson informed them that one Robert Jackson, a former tenant, was intoxicated and had been banging on her front door. However, Mrs. Wilson declined to file a formal complaint. A short time later, after resuming car patrol, Holmes observed a man who appeared to be intoxicated, and who identified himself as Robert Jackson (the defendant), attempting to start a white Ford in a hotel parking lot. When the defendant

admitted that he had been at the Manhasset address of Mrs. Wilson earlier, Holmes informed him that he would be arrested if he bothered her again. Holmes then used his car radio to check if the defendant had any outstanding warrants. Upon receiving an indication that there was a possible warrant, Holmes frisked him and found three .22 calibre bullets in his front pocket. However, a thorough search of the defendant's person revealed nothing further and the bullets were returned to him by Holmes. When the warrant check revealed that the defendant was not wanted, Holmes drove him to a diner about a mile away. During a conversation in the radio car, the defendant mentioned that he lived at Spinney Hill Drive with one Floyd Brooks (whom Holmes knew), and that he had operated a blue truck at one time. Holmes then testified that after he dropped the defendant off at the diner and resumed car patrol, he remembered that *three* weeks before, he had been informed by a reliable confidential informer that a Robert Jackson was in possession of several guns, one of which was a .22 semiautomatic with a white grip, that Jackson was related to or was a close friend of Floyd Brooks and that Jackson previously was a truck driver and had a truck. The informer also indicated that Jackson initially kept the weapon in his truck but upon disposing of the truck, he kept it either in his white *Ford* or on his person. Holmes admitted that although while on car patrol after he dropped the defendant off at the diner, he and his partner passed the white Ford, they did not attempt to search it. Continuing his narrative, Holmes testified that at 3:50 that morning he again saw the defendant enter the white Ford in the hotel parking lot. When Holmes and his partner approached the defendant's vehicle, he noted that the latter was sitting on the running board with his feet on the ground. The car's dome light was lit. The defendant, who appeared intoxicated, said he was trying to start the vehicle. While fumbling with the ignition he dropped the car keys near the gas pedal. Holmes asserted that upon observing the defendant reach down and put his hand *under the car seat,* he called for assistance. When assistance arrived he told the defendant to leave his vehicle. After exiting, the defendant locked the door. Holmes then told him he was under arrest for *"possession of a loaded gun, the gun that is under the front seat of [the] car"* (emphasis supplied). While the other officers restrained the defendant, who was resisting being handcuffed, Holmes removed the car keys from the defendant's front pocket, opened the door of the white Ford and pulled out a fully loaded black gun with a white grip. *This was the first time he had seen the gun.* After Holmes had completed this initial testimony and another detective, John Skuzenski, had also testified, the trial court heard the testimony of the informer *in camera* in the absence of defense counsel. After finding the informer to be reliable and credible, the trial court reviewed his testimony. The informer had testified that he saw the defendant carrying a gun on four or five occasions from mid-October, 1975 to November of 1975 and that he kept it either on his person (waistband) or in his blue van truck. Furthermore, he also saw three or more guns in the defendant's home, one of which was a white handled gun. According to the informer the defendant was presently driving a white Ford. The Trial Judge then related that the informer also testified that just *two days before the defendant was arrested on January 5, 1976,* he saw him with a gun and *conveyed that information to Holmes.* He gave Holmes a description of the defendant and told him that he was a relative of Floyd Brooks with whom he lived on Spinney Hill Drive. In view of the discrepancy between Holmes' initial testimony and that of the informer as to the last time they met before the defendant's arrest, the former was recalled for further questioning. On recall Holmes

admitted that his memo book had no indication that he met the informer two or three days before the defendant's arrest. He then testified that he did recall that such a meeting had taken place, but added: *"I can't recall the incident to my fullest knowledge of what he had told me,* but I believe there was such a meeting" (emphasis supplied). Furthermore, according to Holmes, he could not recall how recently the informer had said he had seen the defendant in possession of a weapon. He did state that as a result of information given to him by the informer, he had kept Brooks' home on Spinney Hill Drive under surveillance several times in an attempt to find the defendant. However, he never made notations as to those occasions, never saw the defendant there and could not recall ever seeing a white Ford in the area of Brooks' home. Although Holmes was not certain, he believed he had "probably" placed the house on Spinney Hill Drive under surveillance two or three days before the defendant was arrested. At no time before the arrest did Holmes attempt to procure a search warrant for Brooks' home. The trial court, in denying suppression of the white handled pistol, found, *inter alia,* that one or two days prior to the arrest of the defendant, the informer had seen a gun in the defendant's possession and had conveyed such information to Holmes. It further found that when the arrest was made on January 5, 1976, Holmes had probable cause to believe that the defendant was in possession of a firearm. We disagree with this conclusion. First of all, the testimony of Holmes does not sustain the proposition that his reason for arresting the defendant on January 5, 1976, for possession of the weapon, was based on what the informer had told him two or three days before. Holmes admitted on recall that he did not remember how recently the informer had mentioned to him that he had seen the defendant with a weapon and that his memo book had no notation about such a meeting on January 2 or 3, 1976. Thus the evidence adduced does not demonstrate that the *raison d'etre* for the arrest of the defendant by Holmes and the ensuing search of the white Ford was the information given Holmes by the informer two or three days earlier. Furthermore, Holmes' "modified" testimony on recall, after the trial court had related the testimony of the informer, seems highly incredible and even ludicrous. Although Holmes testified he "probably" placed the home of Brooks under surveillance as a result of his meeting with the informer two or three days prior to the defendant's arrest and was also given a detailed description of the defendant at that time, he still failed to recognize him at their initial and prolonged encounter at 12:05 A.M. on January 5. Although he supposedly made the connection shortly after the defendant left the patrol car and entered the diner, Holmes did not call for assistance, attempt to arrest him or stake out either the diner or the hotel parking lot where the white Ford was parked. Rather, according to Holmes, he resumed routine patrol, issued some parking tickets, etc. Under the circumstances, it strains the imagination to believe that a trained police officer, having received such information from a reliable informer, would either fail to recognize the subject of that information immediately, or having belatedly realized the connection between the defendant and such information, would simply go about his routine police business. Thus, assuming Holmes received any pertinent information from the informer, it seems evident from his initial testimony that he would have been relying on what was told him by the informer three weeks or more before the defendant's arrest, namely that the informer had seen the defendant carrying a gun in his waistband and that it had been kept in the blue van truck and the white Ford. In our opinion such information gleaned anywhere from three weeks to more than a month

before the defendant's arrest would be stale and thus could not constitute probable cause for the warrantless search of the white Ford (cf. *Sgro v United States,* 287 US 206; *People v Loewel,* 50 AD2d 483; *People v Bershany,* 43 Misc 2d 521). The mere fact that the defendant may have been in possession of a weapon several times since October, 1975, did not render it probable that there was a weapon in his car on January 5, 1976. Moreover, contrary to Holmes' contention during his initial testimony, at no time did the informer testify that he ever saw the white handled pistol in the defendant's white Ford. What is even more significant is that the trial court made no finding that a gun was ever seen in the subject vehicle. Thus, the arrest of the defendant by Holmes for "possession of a loaded gun * * * under the front seat of * * * car", without ever having seen it previously, was a flagrant abuse of police power and should not remain uncorrected (cf. *People v Collier,* 56 AD2d 634). It should also be observed that although Holmes testified that the defendant had put his hand under the seat after fumbling with the ignition and dropping his keys, the trial court did not mention such testimony to support its conclusion that probable cause existed for the search of the subject vehicle. We are also of the opinion that the statement the defendant made to Detective John Skuzenski at the police precinct shortly after his arrest should likewise be suppressed. Skuzenski testified at the suppression hearing that he first met the defendant at the precinct at about 4:00 A.M. on January 5, 1976. He stated that the defendant appeared normal and did not smell of alcohol. According to Skuzenski the defendant indicated he understood what had been read to him from a "rights" card by the detective, and that he then waived his rights. Skuzenski testified that he questioned the defendant and, showing him the gun, asked if it was his. Defendant purportedly said it was; however, he refused to state where or how he had gotten it and would not provide a written statement. The defendant did, however, initial the gun. In our opinion, Skuzenski's testimony that the defendant did not smell of alcohol and appeared normal at approximately 4:00 A.M. is totally at variance with the testimony of Holmes, who stated that at 3:50 A.M. the defendant, when fumbling with his keys to get the white Ford started, still appeared intoxicated, and that when, on their way to the precinct, he advised the defendant of his rights, the latter was "still a little intoxicated". In any event, since the defendant's statement was obtained only minutes after the illegal arrest and search and seizure, it was not so attenuated from such illegal actions as to be free of taint (see *People v Stewart,* 41 NY2d 65, 70; *Brown v Illinois,* 422 US 590). Accordingly, the motion to suppress should be granted and the indictment dismissed. Damiani, J. P., Titone, Rabin and Gulotta, JJ., concur.