THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ROLAND SAMUELS, Appellant.

First Department, July 10, 1979

## APPEARANCES OF COUNSEL

*Ellen Schneider* of counsel *(William E. Hellerstein,* attorney), for appellant.

*Gabrielle Rhodes* of counsel *(Norman Barclay* with her on the brief; *Robert M. Morgenthau, District Attorney),* for respondent.

## OPINION OF THE COURT

LUPIANO, J.

The following testimony was elicited at a suppression hearing:

On January 8, 1977, Detective Daniel Fougere of the Street Crime Unit of the New York City Police Department (an experienced officer) and his partner were assigned to patrol a high-crime area encompassing West 42nd Street in Manhattan. At about 7:30 P.M. Detective Fougere (dressed in civilian clothes) observed the defendant first look in the display window of a novelty store on 42nd Street between Seventh and Eighth Avenues and then enter the store, which was directly across the street from where the officer's vehicle was parked. The officer was familiar with the store and knew that in addition to sexually-oriented reading material it offered for sale holsters, knives and imitation police badges. He exited the vehicle and went across to the store front and looked in. He observed the defendant, part of whose back and side were toward the officer, purchase a holster for a .25 caliber automatic pistol. When the sale was completed, the salesperson placed the holster in a paper bag and handed it to the defendant. This transaction occurred in the front part of the store premises, i.e., the part closest to the street.

The defendant left the store and walked west on 42nd Street toward Eighth Avenue, holding the bag in his left hand with his right hand by his side. Detective Fougere and his partner followed and caught up to defendant at the corner of 42nd Street and Eighth Avenue, a distance of some 75 feet from the store. Detective Fougere identified himself to the defendant as a police officer and displayed his shield. The police did not

draw their weapons or physically touch defendant. The detective merely stated: "May I ask you a question" and proceeded to inquire of defendant as to why he had bought a holster. The defendant's immediate response was to put his right hand into his coat pocket. Detective Fougere further testified: "At that time, defendant Samuels put his hand in his pocket. I told him to remove his hand. He didn't." The officer then declared that he grabbed the defendant's hand from the outside of the coat, through the fabric of the coat pocket. In consequence, he felt what appeared to be a gun being held in the defendant's hand. He told the defendant to remove his hand from the pocket, threatening to "break [his] head" if he did not and shouted to his partner that defendant had a gun. When the defendant complied with the officer's order, the latter reached into the defendant's right coat pocket and removed a loaded .25 caliber automatic pistol.

Defendant testified that prior to going into the novelty store to purchase the holster, he stopped at another store to pick up his wife's camera and purchased film and flashbulbs. A receipt of payment given, it is alleged by defendant, for these items was introduced in evidence. After purchasing the holster he exited the novelty store holding the camera, film and flashbulbs in a paper bag under his left arm and holding the holster in another bag in his left hand. His right hand was in his coat pocket as he walked. Upon reaching Eighth Avenue, an officer other than Detective Fougere approached, displayed a shield and identified himself as a police officer. Upon inquiry as to what he had just purchased, defendant volunteered that he had purchased a holster. The officer next inquired if defendant had a gun, to which he responded in the negative. According to defendant at this point Detective Fougere patted down defendant's outer clothing but failed to touch the gun. Upon standing up after the initial pat down, the detective patted down the defendant's right coat pocket, disclosing the presence of the gun.

The issue thus confronting the court at this suppression hearing was basically one of credibility. In denying defendant's motion to suppress as evidence against him the .25 caliber automatic pistol taken from defendant's person, the hearing court stated: "On the basis of the Court's observations of both witnesses during the time they testified, the testimony of Detective Fougere is deemed to be more credible than that of the defendant. Defendant's description of the manner in

which he allegedly carried the camera is difficult to accept. Holding the camera under his armpit and placing his unencumbered right hand into his coat pocket appears incredible when one considered the fragility of the transported instrument and the attendant risks of damage if it were dropped from such an insecure hold. Similarly, his description of the circumstances surrounding his interruption, search and arrest by a police officer other than Detective Fougere strains one's credulity when consideration is given to the testimony of Detective Fougere which was so definite, specific and unimpeached."

■ No basis exists on this record warranting departure from the hearing court's resolution of the credibility issue other than mere speculation. Credibility is to be determined by the trier of the facts—in this instance, the hearing court.

"One of the safeguards afforded the trier of fact in determining the credibility of oral evidence is the opportunity of observing the demeanor of witnesses while they are testifying" (65 NY Jur, Witnesses, § 88).

"The advantages of the trial court who saw and heard the witnesses should be considered and, when truth hangs upon the credibility of witnesses, his decision should be given the greatest weight *(Boyd v. Boyd,* 252 N.Y. 422, 429; *York Mortgage Corp. v. Clotar Const. Corp.* 254 N.Y. 128, 134; *Smith v. Smith,* 273 N.Y. 380, 383)" *(Amend v Hurley,* 293 NY 587, 594).

"Generally and whenever possible, the fact-finder, be it the court or a jury, should be able to see and hear the witness *(Schrickler v City of New York,* 35 AD2d 743), since the appearance, attitude and demeanor of a witness upon being questioned and while before the court are matters to be taken into consideration in testing veracity and in determining the weight to be accorded his or her testimony *(Matter of Nowakowski,* 284 App Div 655, 657, affd on rearg 1 AD2d 250, 252, affd 2 NY2d 618). Indeed, the opportunity of observation often affords the most accurate method of ascertaining the truth [citation]" *(People v Carter,* 37 NY2d 234, 239). The testimony of Detective Fougere is not inherently incredible or improbable. It is noted that defendant apparently has a criminal record and has had no conflict with the law for six years prior to the incident.

On appeal, defendant contends that the Supreme Court incorrectly denied his motion to suppress the weapon. The

legal question thus presented is whether the police conduct herein as testified to by Detective Fougere is reasonable within the context of the unfolding dynamics of this street encounter. Guidance is found for proper resolution of this issue in *People v De Bour* (40 NY2d 210). Observing that "The practical necessities of law enforcement and the obvious fact that any person in our society may approach any other person and attempt to strike up a conversation, make it clear that the police have *the authority to approach civilians"*, the Court of Appeals declared that "a policeman's right to request information while discharging his law enforcement duties will hinge on the manner and intensity of the interference, the gravity of the crime involved and the circumstances attending the encounter" *(People v De Bour, supra,* p 219; emphasis supplied). That court then outlined the four tiers of street encounter: informational inquiry, common-law right to inquire, forcible stop and detention, and right to arrest and take into custody (representing various intensities of police action) as applied to the unfolding dynamics of a street encounter: "In evaluating the police action we must consider whether or not it was justified in its inception and whether or not it was reasonably related in scope to the circumstances which rendered its initiation permissible [citation]. We bear in mind that any inquiry into the propriety of police conduct must weigh the interference it entails against the precipitating and attending conditions. By this approach various intensities of police action are justifiable as the precipitating and attendant factors increase in weight and competence. *The minimal intrusion of approaching to request information is permissible when there is some objective credible reason for that interference not necessarily indicative of criminality" (People v De Bour, supra,* pp 222-223; emphasis supplied).

 ■ In our case, the police officer who was an eyewitness to a sale whereby the defendant purchased a holster for a .25 caliber pistol, which purchase, while not necessarily indicative of criminality, nevertheless formed an objective credible reason for the minimal intrusion of approaching defendant to request information, i.e., why had defendant purchased a holster. No one needs a permit or license to purchase or carry a holster. Indeed, a holster may serve a number of purposes, decorative and otherwise. However, the general purpose of a holster is to serve as a case for a firearm, to wit, a pistol to be carried on the person. Patently, it is well recognized that in

New York City a permit is required for the possession of a pistol and also for the right to carry such weapon on one's person. If one endeavors to possess and carry such firearm without the requisite permit, one is in violation of law. In light of the facts that the area in which this incident occurred is a high-crime area and that a purchase of a holster *may be* indicative of possession of a firearm, the police officer exhibited simple common sense in attempting to elicit information from the defendant as to why he purchased the holster. Also, we must recognize that the police—indeed the citizenry at large, are not unmindful of the statistics as to the use of handguns in the precipitation of crimes.

Continuing with the Court of Appeals analysis: "The next degree, the common-law right to inquire, is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in that a policeman is entitled to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure [citations]. Where a police officer entertains a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor, the CPL authorizes a forcible stop and detention of that person (CPL 140.50, subd 1; see *Terry v Ohio,* 392 US 1; *People v Cantor, supra* [36 NY2d 106]). A corollary of the statutory right to temporarily detain for questioning is the authority to frisk if the officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed (CPL 140.50, subd 3)" *(People v De Bour, supra,* p 223).

In this case the officer's civil inquiry was met not with an oral response by defendant, but by a physical action—that of putting his free hand, the right hand, into his coat pocket. Such circumstance, while in and of itself an equivocal act, could be reasonably interpreted in light of the antecedent circumstance of the purchase of the holster, as a furtive movement sufficient to alert the officer to the formation of a reasonable suspicion that a crime is in some fashion involved. This action by defendant introduced a new factor into the unfolding drama and served to forge another link in the chain of events—namely, a furtive act, one serving to give an articulate reason justifying the officer's fear for his safety and that of his fellow officer and suspicion that criminal activity was afoot.

*People v Santiago* (64 AD2d 355, order vacated due to

defendant's demise 67 AD2d 843)* is inapposite because in that case there was no furtive movement of placing one's hand in one's pocket in response to a police inquiry in the context of a street encounter, but rather a failure to remove one's hand from one's pocket in response not to an inquiry, but to a direction. Second, the majority holding in *People v Santiago (supra),* disposed of the case on the simple predicate that the police had no common-law right of inquiry under the circumstances therein and did not concern itself with application of the right of inquiry for information based on an articulate reason. Third, analysis of the police conduct subsequent to the initial stop in the majority holding of *Santiago* is set forth in dicta based on the assumption, *arguendo,* that the police were acting on more than mere hunch therein *(People v Santiago, supra,* p 361).

In our case, Detective Fougere exhibited the apprehension caused by defendant's furtive act of placing his right hand in his pocket by requesting defendant to take his hand out of his pocket, which request was not complied with. Thus to the furtive act enunciated above, defendant now added an evasive one by refusing the reasonable request of the officer to simply remove his hand from his pocket. In view of these intervening circumstances and the fact that this train of events had its inception in the purchase of a holster, the officer grabbed defendant's hand from the outside of the coat and through the fabric felt an object being held in defendant's hand which object impressed the officer as being a gun.

Relevant to the foregoing, I reiterate the general observations I first uttered in my dissent in *People v Santiago (supra,* pp 365-366), to wit:

"Jurists are not compelled to imitate the ostrich with its reputed penchant for sticking its head in the sand when faced with a precarious situation. Statistics as to the use of handguns in the perpetration of robberies * * * lend convincing credence to the reasonableness of the request by [the police] to defendant to remove his hand from his pocket. A person holding his hand in his pocket, who has already acted equivocally enough to attract the attention of the police in the reasonable discharge of their duties, may well be, under the particular circumstances of the street encounter, concealing a

---

* The subsequent endeavor by the People to obtain leave to appeal to the Court of Appeals was frustrated by the intervening death of the defendant Santiago.

gun or some other dangerous instrument that might be utilized against the police.

"A law-abiding citizen approached by the police under the circumstances herein as remarked upon by the Court of Appeals in *People v De Bour* (40 NY2d 210, 219, *supra)* would have exhibited 'the tendency to submit to the badge' and complied with what is patently a limited intrusion of his 'right' to be left alone, namely, the request to remove his hand from his pocket. The refusal by defendant to comply * * * introduced a new factor * * * and now served to forge another link in the chain of events—namely, an evasive act, one serving to give an articulate reason justifying the officers' fear for their safety and suspicion that criminal activity was afoot. Of some relevance is the succinct observation in *People v Stroller* (42 NY2d 1052, 1053), by the Court of Appeals: 'When, upon inquiry by the police, the defendant gave an unintelligible, unresponsive reply, the officer could then make a limited pat down search in the nature of a frisk, not to discover evidence of a crime, but in order to *pursue his investigation without fear of violence* (see *People v Stewart,* 41 NY2d 65).' (Emphasis supplied.) The sign of peace and friendship from time immemorial has been the exposed hand, whether by way of a handshake or raised up, palm outward, disclosing the absence of a weapon and thus, a friendly gesture.

"Under the circumstances herein, the officers did not approach defendant with guns drawn or with their hands upon their own weapons. Beyond peradventure the ordinary citizen would feel less threatened by a request to remove his hand from his pocket by a police officer displaying a badge and giving notice that he wanted to ask a few questions than by an officer initiating such inquiry with gun drawn or with his hand on the gun. In asking defendant to remove his hand from his pocket [Detective Fougere], chose the least restrictive alternative compatible with protecting himself and his fellow officer. Indeed, the natural order of events dictates that a law-abiding citizen under these circumstances would not even construe this request as a 'petty indignity.'

"It is evident from scrutiny of the record herein that [the police] were worried about the danger that defendant was carrying a hidden weapon * * * [D]efendant's failure to obey the detective had increased the policemen's apprehension of danger to themselves since now the hand-in-pocket posture

.could no longer be viewed as merely accidental, but as one willed."

Patently, the police had proper grounds to initially approach defendant. His response of placing his free hand in his pocket, coupled with his subsequent noncompliance with the request to remove that hand from his coat pocket, gave rise, together with the facts initially prompting inquiry, to a reasonable suspicion that defendant was engaged in criminal activity and might be armed and dangerous. The graduated response of Detective Fougere in placing his hand over defendant's pocket, the one in which defendant concealed his free hand, constituted proper police conduct, that is, a heightened intrusion short of a complete physical seizure to remove the element of danger. This action disclosed the presence of a small handgun concealed in defendant's pocket, and the escalating series of events blossomed into a situation fully justifying a forcible stop and detention "A corollary of the statutory right to temporarily detain for questioning is the authority to frisk if the officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed (CPL 140.50, subd 3)" *(People v De Bour,* 40 NY2d 210, 223, *supra).*

Surely in light of the prevalence of handguns as a means of facilitating crime, a reality of contemporary urban society, it is not mere whimsy, but common sense, for an officer in a high-crime area to inquire of a citizen as to why he purchased a holster, the officer having just observed the sale transaction. Succinctly stated, the purchase of the holster furnished an "articulable reason to inquire." The circumstances herein do not present a situation suggestive of police harassment, improper police motivation or precipitate police conduct.

Indeed, the instant case serves as an apt illustration of certain general observations on law enforcement I first had occasion to enunciate in *People v Santiago (supra,* pp 367-368), to wit: "The perception by the citizenry of the functioning of the law enforcement system which entails the conduct of the police and of the criminal justice system which entails the dispensation of justice to those charged with crime is a potent factor in the morale and maintenance of a free and civilized society. A society which proclaims itself free but whose citizens rightly or wrongly believe the scales of justice most noticeably 'favor' the criminal and ignore the plight of the victim and whose citizens increasingly retreat into isolation through fear that utilization of the public streets, transporta-

tion and facilities will expose them to criminal endeavors, is a society in retreat from freedom. The law is not static, but dynamic. However, the process of change is neutral and in its effects, insofar as controllable by man, is sometimes good and sometimes bad. Men make good laws as well as bad. The bad laws most noticeably result when there exists an unfettered, blind devotion to an ideal, an abstract absolute principle which ignores the reality of the individual person. If freedom is interpreted in an abstract absolute sense as the right to do what one wants, then no one is free. It is the interrelation of rights with their corresponding duties which preserves the dynamics of true freedom and this mandates the maintenance of a reasoned authority to maximize the true enjoyment of freedom by the individual. In our society we have placed the responsibility of maintaining a reasoned civil order in the first instance on the police. It is only fair, therefore, that we view the policeman as a real person, one imbued with the strengths and weaknesses of his or her fellow man, albeit one possessed of a certain expertise acquired by training and experience. Ensconced within the safety of our libraries, our courtrooms and our homes, we must not forget the reality that it is the police to whom we look for protection and for succor and whom we place in natural proximity to the criminal world as a line of defense. Entrusting the police officer with a gun, we expect the faithful discharge of duty, even to the death. Yet, when the officer discharges that duty we sometimes, in examining the correctitude or reasonableness of that discharge, scrutinize the officer not as a real human being, but as an abstract, a myth, the perfectly rational man. This is a danger to be avoided."

Viewing Detective Fougere and his fellow officer as real human beings, and mindful of the realities of the dangers posed to the police in the discharge of their duties, it must be concluded on this record that the conduct of the police was reasonable and did not constitute an overly intrusive act subversive of the freedom of a citizen.

Concerning the right to inquire apart from common-law inquiry, it is recognized that a citizen does not have an absolute right to be free from an official interference by way of inquiry *(People v De Bour, supra)*. If this were so, then any inquiry initiated by the police, regardless of the circumstances generating their need or desire to initiate an encounter with a citizen, would mandate a choice between seizure of the citizen

or inaction on the part of the police. The Court of Appeals explicitly relying on the sure guide of common sense and the practicalities involved, characterized the talisman for judging the propriety of police conduct at any of the three levels of intensity of intrusion—inquiry, common-law right to inquire and forcible stop and detention, to be "whether or not the police behavior can be characterized as reasonable" *(People v De Bour, supra,* p 217). The Court of Appeals in *De Bour* was clearly mindful of the necessity to avoid placing "unrealistic restrictions" on the authority of the police to approach citizens, and declared "reasonableness" to be "the overriding requirement." Obviously, if the police may justifiably approach a citizen and address questions to that citizen based not on mere caprice, but because there is "some objective credible reason" to do so, albeit that objective reason is not necessarily indicative of criminality *(People v De Bour, supra),* the nature of those questions may be directed toward and based upon that very same objective credible reason. To hold otherwise is to give the police an illusory power, because if they cannot inquire of the citizen as to the circumstances surrounding the objective reason which justifies their intrusion on the freedom of the citizen, there is no necessity for that intrusion.

Thus in our case, to view the purchase by defendant of the holster, observed by the police, as an objective reason justifying the minimal intrusion on the freedom of the defendant to obtain information, but to limit the inquiry to information of a general nature, i.e., information not specifically directed to that objective reason, is to unreasonably restrict the authority of the police to approach citizens and to, in effect, impede them in the proper exercise of their law enforcement function. Common sense mandates that the police in initiating an inquiry based upon the objective credible reason of the purchase of the holster, may inquire as to the purchase of that holster. As observed by Mr. Justice WHITE in *Terry v Ohio* (392 US 1, 34): "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets."

As aptly noted in *Adams v Williams* (407 US 143, 145-146): "In *Terry* this Court recognized that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make

an arrest.' [392 US 1] at 22. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. See *id.,* at 23 * * * The Court recognized in *Terry* that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect. 'When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' he may conduct a limited protective search for concealed weapons. 392 U.S., at 24. The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law. So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." The dissent under the circumstances herein would have the policeman lacking probable cause to arrest, simply shrug his shoulders rather than investigate possible criminal behavior. "There is no war between the Constitution and common sense" *(Mapp v Ohio,* 367 US 643, 657).

The determinative circumstances in the search for truth herein are the purchase of a holster by a person—in this case, a man—in a high-crime area, and whether that conduct may serve as a predicate for the minimal intrusion by the police on the freedom of that citizen to simply inquire as to the purpose underlying the purchase. It is the dissent's view that no such inquiry may be made under the law.

Finally a succinct statement of the value of probable cause follows: "The contours and salient principles of probable cause have been faithfully catalogued in a surfeit of decisional law. Probable cause exists when known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that an offense has been or is being committed * * * A significantly lower *quanta* of proof is required to establish probable cause than guilt * * * Probable cause does not emanate from an antiseptic courtroom, a sterile library or a

sacrosanct adytum, nor is it a pristine 'philosophical concept existing in a vacuum,' * * * but rather it requires a pragmatic analysis of 'everyday life on which reasonable and prudent men, not legal technicians, act' * * * It is to be viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest guided by his experience and training * * * It is 'a plastic concept whose existence depends on the facts and circumstances of the particular case' * * * Because of the kaleidoscopic myriad that goes into the probable cause mix 'seldom does a decision in one case handily dispose of the next' * * * It is however the totality of these facts and circumstances which is the relevant consideration * * * Viewed singly these factors may not be dispositive, yet when viewed in unison the puzzle may fit" *(United States v Davis,* 458 F2d 819, 821).

The Supreme Court correctly denied defendant's motion to suppress the seized .25 caliber revolver. The judgment of the Supreme Court, New York County (LEONFORTE, J., at suppression; SILBOWITZ, J., at plea and sentence), rendered October 3, 1977, convicting defendant on his plea of guilty of attempted possession of a weapon in the third degree, should be affirmed.

FEIN, J. (dissenting). Defendant appeals from a judgment convicting him on a plea of guilty to attempted criminal possession of a weapon in the third degree in satisfaction of an indictment charging him with criminal possession of a weapon in the third degree, and sentencing him as a predicate felon to a term of 1½ to 3 years.

The issue is the propriety of the denial of defendant's motion to suppress.

By its affirmance, the majority today rules that the purchase of a gun holster, at 7:30 P.M. in a novelty store engaged in the sale of such items on 42nd Street between Seventh and Eighth Avenues in Manhattan, is a suspicious circumstance entitling the police to stop and detain the purchaser to inquire as to the purpose of the purchase, no matter how innocent or innocent appearing the purchaser may be.

I disagree. The motion to suppress should have been granted.

Two witnesses testified at the suppression hearing. Detective Fougere, an experienced officer, testified that on January 8, 1977, at about 7:30 P.M., while dressed in civilian clothes on duty in a police taxicab at 42nd Street, between Seventh and

Eighth Avenues, in the Borough of Manhattan, he observed defendant looking at merchandise on display in the window of a novelty store located across the street from where the officer's vehicle was parked. He observed that defendant paid particular attention to items on a top shelf in the display window, where Fougere knew that gun holsters were usually exhibited. As defendant entered the store, Fougere crossed 42nd Street and observed defendant from outside of the store's entrance. He watched as Samuels purchased a small gun holster, and left the store carrying the purchase in a paper bag in his left hand. Fougere and his partner, Detective Reck, followed defendant along 42nd Street to Eighth Avenue, at which point he stopped defendant and said: "Police. May I ask you a question? Why did you buy the holster?" Fougere testified Samuels did not respond, but instead put his right hand inside the right pocket of his winter coat. Samuels' right hand had previously been at his side, according to the detective, who also observed Samuels was not wearing gloves. The officer directed defendant to take his hand out of his pocket. When Samuels did not immediately comply, Fougere grabbed Samuels' hand through the outside of the coat. Feeling what he believed to be a gun in Samuels' hand, Fougere directed defendant: "Get your hand out of your pocket, or I'll break your head." Fougere reached into the pocket and pulled out a loaded .25 caliber automatic revolver. He thereupon placed defendant under arrest. The weapon was a flat gun, smaller than the size of a man's hand.

Defendant's account differed significantly. He stated he had gone to the novelty shop after picking up his wife's camera in another store, where he had bought film and flash cubes. In the novelty store, he purchased a small brown suede holster. Although Fougere did not recall whether defendant was holding another brown paper bag larger than that containing the holster, defendant offered at the hearing a receipt from the Robin Camera Company evidencing defendant's receipt of the camera, film and flash cubes. Defendant testified that when he left the store he was carrying the bag containing the holster in his left hand and the bag containing the camera, flash cubes and film under his left armpit. His right hand was in the pocket of his winter coat. While walking west on 42nd Street toward Eighth Avenue, he was stopped by three officers. Another officer, not Fougere, asked defendant what he had purchased in the store. Defendant replied that he bought

a holster, whereupon that officer asked defendant if he had a gun. When defendant responded in the negative, Fougere directed him to take his hand out of his pocket. He complied with this request, but Fougere nevertheless patted him down, finding the gun. The officer took the weapon from his pocket and placed defendant under arrest after throwing him into a nearby telephone booth.

The suppression Justice recognized that the purchase of the holster was not itself illegal, but found it did furnish Fougere with "an 'articulable reason' to inquire." The suppression Justice accepted Fougere's account and found that when Samuels "failed to answer * * * and placed his right hand into his coat pocket, it was reasonable to suspect that the purchaser of a holster might also be in close possession of a gun nearby to be accommodated by such holster." The court also found that defendant's failure to take his hand out of his pocket at Fougere's direction justified the seizure of the hand, which led to discovery of the gun. The court concluded that Fougere's actions were reasonable under the circumstances to ensure his own safety, finding that he acted upon a "reasonably grounded suspicion" that defendant was in possession of a gun and that the "seizure * * * provided probable cause to believe that a crime was being committed in the officer's presence."

I disagree. Assuming Fougere's account of the events, I find no basis for the officers' stop and detention of Samuels based solely on Fougere's observations that Samuels had purchased a holster. The Legislature has not seen fit to proscribe the purchase of gun holsters. Such purchase was not a crime. Plainly, Fougere proceeded on no more than a vague or unparticularized hunch, "the product of mere whim, caprice, or idle curiosity." (People v Ingle, 36 NY2d 413, 420.)

The majority sustains as proper the conduct of Fougere as either a minimal intrusion to request information or within the officer's common-law right to inquire, the first and second levels of intrusion approved in People v La Pene, the companion case to People v De Bour (40 NY2d 210). On the sliding scale of justifiable police intrusion, the first level authorizes a minimal intrusion to approach to request information where there is "some objective credible reason", although not necessarily indicative of criminal conduct. The second level, the common-law right to inquire, somewhat more intense than the first level "is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in

that a policeman is entitled to interfere with a citizen to the extent necessary to gain explanatory information, but short of forcible seizure" *(People v De Bour, supra,* p 223). The third level sanctions a forcible stop and detention encompassed within CPL 140.50 (subd 1), where the officer entertains a reasonable suspicion that a person has committed, is committing or is about to commit a felony or misdemeanor. The statutory right includes the right to detain and the corollary right to frisk if the officer reasonably suspects himself to be in physical danger. (CPL 140.50, subd 3.)

In assessing the reasonableness of the actions of the police officer, and hence their legality "we must consider whether or not the action of the police was justified at its inception and whether or not it was reasonably related in scope to the circumstances which rendered its initiation permissible." *(People v Cantor,* 36 NY2d 106, 111; *People v De Bour, supra,* p 222.)* It is useful first to examine whether the circumstances warranted the second level of intrusion, the common-law right to inquire. Was there "a founded suspicion that criminal activity is afoot" *(People v De Bour, supra,* p 223), justifying the interference with defendant to gain an explanation as to why he purchased the holster? According to the officer, the only reason for the stop was that he observed defendant purchase a gun holster, plainly not a crime in this State. I find no basis for the conclusion of the suppression court that a person who purchases a holster can be reasonably expected to have a gun nearby to accommodate it. The purchase was made openly in a public store, a novelty store, which admittedly sold products other than holsters, or guns. Other than the purchase, there is nothing in the record which was in any way suspicious so as to call the officer's attention to defendant in the first instance. For all Fougere knew, defendant could have been a collector of guns or holsters. The purchase, concededly legal, did not furnish the officer with a justifiable basis to stop and inquire.

Nor may the stop be justified under the first level of intrusion, which authorizes an approach "to request information * * * when there is some objective credible reason for that interference not necessarily indicative of criminality" *(People v De Bour, supra,* p 223). Such an intrusion contemplates a request by the police for general information, such as a person's name and address, or appropriate identification, or information to aid in investigating a crime. There was no such

inquiry here. Where, as here, the inquiry is focused upon defendant's conduct, justification for the detention must be found at the second level of intrusion, the common-law right to inquire. Fougere's inquiry was directed at specific actions on the part of defendant, to wit, why he had purchased the holster and whether or not he had a gun. To attempt to sustain such inquiry as a mere informational inquiry as does the majority would sanction arbitrary detentions by law enforcement officials despite the absence of objective evidence to warrant a "reasonable suspicion" of "criminal activity".

The rationale of the majority would authorize a similar police inquiry of every customer outside every novelty store in the 42nd Street area. Plainly, such police action would not pass constitutional muster, even though, as Fougere testified, 42nd Street between Seventh and Eighth Avenues is classified by the police as a high-crime area. The purchase of a holster in a novelty store, early in the evening at 7:30 P.M. by a Black man, wearing a winter outer coat, is insufficient to justify police action stopping and detaining the purchaser to inquire as to the reason for the purchase. "An individual's right to walk the public streets without fear and annoyance should not be circumscribed by permitting the police to stop and interrogate him on the basis of a 'hunch', that will be wrong as often as it is correct." *(People v Moore,* 62 AD2d 155, 157.) Mere purchase of a holster does not give rise to reasonable suspicion of criminal activity as to authorize the police in detaining defendant to seek information as to why the purchase was made. There being no right to stop and inquire, the subsequent frisk and search were unlawful.

Moreover, even assuming Fougere's account of what transpired, I find no reasonable basis to authorize the seizure of defendant's hand through the outside of the coat.

The mere placement of one's hand in one's pocket, or keeping it there, without more, does not create a suspicion that an individual is armed. *(People v Bernard,* reported with *People v Prochilo,* 41 NY2d 759, 762-763; *People v Santiago,* 64 AD2d 355, 361.) There was no visible evidence of a gun, no outline, or bulge, and no conduct, other than the equivocal purchase of the holster, suggesting the presence of a weapon.

As stated in *People v Santiago (supra,* p 361): "Before an officer 'places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search

for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.' *(People v Sibron,* 392 US 40, 64; *People v Stewart,* 41 NY2d 65, 69; see, also, *People v Sterling,* 63 AD2d 210.)"

No such facts are shown here. Nor is there any testimony on which such inference could be founded. Surveillance of defendant may have been warranted. Detention, search and seizure was not. *(People v Batista,* 68 AD2d 515.)*

There was no objective evidence to justify the officers in stopping defendant even to inquire. To hold otherwise is to ascribe an element of criminality to conduct which the Legislature has not seen fit to proscribe. Defendant was doing nothing which was in any way suspicious. He purchased a holster, which he had every right to do. He was carrying it in a plain paper bag, walking toward Eighth Avenue, when he was stopped and detained by officers, who inquired as to his reason for making the purchase. Nor is there any testimony that the officers were in any way fearful or apprehensive for their own safety. In effect, the majority holds that a citizen, observed purchasing an object which he has every right to purchase, may nevertheless be stopped by an officer, who may question him as to the contents of a bag he is carrying and his reasons for the purchase.

Such holding ignores the requisite standard, which requires "a balancing of the legitimate interests of the defendants against the reasonableness and appropriateness of the police action." *(People v Prochilo, supra,* p 761.)

Accordingly, the judgment, Supreme Court, New York County (LEONFORTE, J., at suppression hearing; SILBOWITZ, J., at plea and sentence), rendered October 3, 1977, should be reversed, on the law, the motion to suppress granted and the indictment dismissed.

KUPFERMAN, J. P., BIRNS and ROSS, JJ., concur with LUPIANO, J.; FEIN, J., dissents in an opinion.

Judgment, Supreme Court, New York County, rendered on October 3, 1977, affirmed.