THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v
TIMOTHY SMITH, Respondent.

First Department, May 10, 1983

### APPEARANCES OF COUNSEL

*Charles E. Knapp* of counsel (*Donald J. Siewert* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Judith Preble* of counsel (*William E. Hellerstein,* attorney), for respondent.

### OPINION OF THE COURT

ASCH, J.

On August 26, 1981 at about 9:50 P.M., Transit Police Officers Christopher O'Brien and Henry McCormick were on the mezzanine level of the 125th Street and Lexington Avenue subway station. Officer O'Brien first noticed defendant as he was walking down the stairs from the street above in the company of another male. From a distance of about 10 feet, the officer observed a distinct bulge in defendant's waistband which "seemed to outline the handle of a gun."

O'Brien told Officer McCormick, who had his back to defendant at this time, that he thought "that guy's got a gun". At the token booth, defendant looked alternately at

his waistband bulge and at the two police officers. When he passed through the turnstile, Officer McCormick also spotted a "pointish" waistband bulge. As the defendant walked by, McCormick "could see an outline * * * possibly a handle." Defendant again glanced at the bulge, then at the police and began walking faster toward another stairway leading to the subway platform.

The two officers followed defendant toward the stairway and, at that point, they both testified, a gust of wind apparently from a moving train first pinned defendant's shirt against the bulge and then lifted the shirt up enough to reveal a pistol handle. The officers, guns still in holsters, approached and Officer O'Brien asked defendant what he had under his shirt. When no answer was forthcoming, McCormick reached under the shirt and took out a loaded Smith and Wesson police service revolver.

The suppression court accepted the officers' description of the bulge at defendant's waistband as "whatever the bulge was it could have been the handle of the gun, not all that different from what the officers said, that this could be a gun." The court rejected, however, the officers' testimony concerning the gust of wind and the testimony relating to the defendant glancing alternately at the bulge and then at the police. With respect to the way the gun was taken, the court asserted "that what happened here was not a simple frisk but a more extreme seizure of the person." It granted the defendant's motion to suppress the gun.

This suppression by the court was in error, on the facts adduced at the hearing or even accepting the findings made by the court.

The observations made by the two officers of a bulge at defendant's waist were sufficient to give them a reasonable suspicion that defendant was armed (see *People v Prochilo,* 41 NY2d 759). The Court of Appeals, in that case, identified three aspects of each individual confrontation to be considered as to whether a police officer's actions were reasonable in the conduct of a frisk leading to the seizure of a gun. "Was there proof of a describable object or of describable conduct that provides a reasonable basis for the police officer's belief that the defendant had a gun in

his possession? Was the manner of the officer's approach to the defendant and the seizure of the gun from him reasonable in the circumstances? Was there evidence of probative worth that there had been a pretext stop and frisk or that the police were otherwise motivated by improper or irrelevant purpose?" (*People v Prochilo, supra,* at pp 761-762.) On the facts presented here, the answers to these questions must be resolved in favor of the police.

The testimony described the object not as a mere bulge but as outlining the handle of a gun. Increasing the suspicion of the officers was the location of the object — in defendant's waistband. "It is quite apparent to an experienced police officer, and indeed it may almost be considered common knowledge, that a handgun is often carried in the waistband" (*People v Benjamin,* 51 NY2d 267, 271). These observations, credited by the suppression court, were sufficient to provide the officers with reasonable suspicion to frisk defendant (*Terry v Ohio,* 392 US 1, 21).

The grabbing of the gun by Officer McCormick was not as Criminal Term held "a more extreme seizure of the person" rather than a frisk. As noted by this court and quoted approvingly by the Court of Appeals "[w]e are unaware of any statute or decisional authority that states that there is only one constitutionally acceptable manner of accomplishing a frisk" (*People v Chestnut,* 69 AD2d 41, 48, affd 51 NY2d 14, 21). The police, in this case, had seen the outline of a gun handle. There was no need for Officer McCormick to engage in a formal "pat-down" to ensure that defendant was armed. Such a course of conduct instead of his initial, unerring grabbing of the gun, might have exposed him and his fellow officer to danger. "It would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety" (*People v Benjamin, supra,* at p 271). The disarming of defendant was reasonably executed and was also accomplished in a minimally intrusive manner under the circumstances present herein.

In reaching our determination, we have done so on the basis that Criminal Term's rejection of a portion of the officers' testimony was warranted. "[M]uch weight must be accorded the determination of the suppression court with

its peculiar advantages of having seen and heard the witnesses (cf. *People v Oden,* 36 NY2d 382)" (*People v Prochilo, supra,* at p 761). However, we note that the court, after all the testimony, observed: "Because you see, I am not inclined to believe in this gust of wind to [*sic*] well. It's a bit fatuitous [*sic*] for my tasts [*sic*]. The thing that puzzels [*sic*] me is watching the officer [*sic*] testify. They didn't look particularly shifty or evasive, you know, *I can't in all honesty say that I could as a matter of fact find them incredible because of their demeanor.* I just find the circumstances which they have described is [*sic*] something which I find it [*sic*] very difficult to accept. It really sounds very tailored to overcome the constitutional objections. On the other hand, it's obvious they saw something because otherwise Mr. Smith would have just gotten on his train and that would have been the end of things." (emphasis added).

Thus, if we accept the court's statement at face value, it did *not* find the officers' testimony incredible, after "having seen and heard the witnesses." This court has the power to make new findings of fact in nonjury cases (*Cohen v Hallmark Cards,* 45 NY2d 493, 498). If we were not reversing the determination of the suppression court solely on the basis of the findings it did make, we would find that the circumstances related by the officers, including the gust of wind and the glances defendant gave to both his waistband and the officers, are not "difficult to accept" but are supported by the testimony and evidence herein.

Parenthetically, during a courtroom demonstration of how defendant appeared with the gun under his "Izod" shirt, he interrupted to say "That's not how I had the gun in my waist, Your Honor," and after intervention by his attorney was permitted to demonstrate how he carried the pistol. It is not difficult to imagine the reaction of the ordinary citizen who might have wandered into the courtroom at this "Alice-In-Wonderland" situation. We are aware that the strictures on police stops and searches serve valid constitutional ends. However, the Constitution is flexible enough so that its provisions can be applied with an awareness of the realities faced by the police in protecting the public.

Accordingly, the order of the Supreme Court, New York County (BERKMAN, J.), entered March 8, 1982, granting the motion of defendant Timothy Smith to suppress a loaded Smith & Wesson police service revolver, should be reversed, on the law and facts, and the motion denied.

FEIN, J. (concurring). I concur in result. The equivocal findings of the suppression Justice were insufficient upon which to base the suppression order. Although, in the words of the suppression Justice, much of the police testimony appeared "very tailored to overcome the constitutional objections", the suppression Justice did not find the testimony as to essential elements to be incredible. Nor do I.

The realities faced by the police in protecting the public should not undercut the ends which the Fourth Amendment was designed to serve. Today the police look for weapons and narcotics, a search we applaud. Tomorrow they may be looking for "the papers", in the same manner, the very danger which the authors of the amendment sought to preclude.* Will the rules we fashion today then apply? The demonstration in the courtroom was not an inappropriate way of attempting to determine what the police really saw. It was hardly an "Alice in Wonderland" exercise to attempt to ascertain whether one could observe a "describable object * * * that provides a reasonable basis for the police officer's belief that the defendant had a gun in his possession" (*People v Prochilo,* 41 NY2d 759, 761). What the suppression Justice observed "in the waistband of the defendant's pants could have been a gun, could have been other things." This was sufficient for a frisk, although such a ruling may discomfort those traveling in subways who carry money belts, wallets, credit card cases and even gloves in their waistbands and look to see if they are still there.

Ross, J. P., BLOOM and ALEXANDER, JJ., concur with ASCH, J.; FEIN, J., concurs in an opinion.

---

* US Const, 4th Amdt: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Order, Supreme Court, New York County, entered on March 8, 1982, unanimously reversed, on the law and facts, and the motion denied.