THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v
JOSEPH JOHN LOPEZ, Respondent.

Second Department, August 1, 1983

**APPEARANCES OF COUNSEL**

*John J. Santucci, District Attorney (Barbara H. D. Gold-
berg* of counsel), for appellant.

**OPINION OF THE COURT**

LAZER, J.

Although the survival of the suppression order at issue
on this appeal depends upon other factors as well, a pri-
mary issue is whether an officer's mistaken belief that he
lacked probable cause for arrest invalidates an arrest that
would otherwise withstand constitutional scrutiny. Con-
trary to the belief of the officer involved, the instant arrest
was supported by probable cause and we hold that his
mistaken belief provides no basis for suppression of defen-
dant's postarrest statements as "poisonous fruit" of an
illegal arrest. Not only would suppression based on the

officer's belief fail to serve the deterrrent purpose of the rule in *Mapp v Ohio* (367 US 643) but judicial evaluation of police action must be based on objective criteria and not an officer's subjective view of his right to make an arrest.

## I

The case is another deriving from the death of Steven Zwickert who was robbed and killed on Queens Boulevard in the early morning hours of May 15, 1980, while returning from a high school prom. Defendant has yet to be tried because of the current appeal from the order that suppressed the statements he made when questioned by a New York detective at the Great Lakes Naval Training Station. As adduced at the suppression hearing, the People's version of the material events is as follows.

During the investigation of the Zwickert homicide, the defendant first came to the attention of Detective Owen Kelly when a suspect, Randolfo Maldonado, mentioned the name "Joe" in a statement. Shortly afterwards, another detective told Kelly that an informant named Wilford Medina had identified defendant as one of the persons present in the assailants' car on the night of the homicide. On June 4, 1980, the father of yet another suspect, Angel Claudio, informed Kelly that one of the four men in the car on May 15 was "Joe Lopez" who joined the Navy on May 28. After ascertaining from naval intelligence that Lopez was stationed at the Great Lakes Naval Training Station in Illinois, Kelly obtained from the Navy a copy of defendant's fingerprints and photographs. Informant Medina subsequently told Kelly that a few hours before the Zwickert murder he saw "Buck", the unapprehended fourth suspect in the case, drive up in a car with defendant in the front passenger seat and Angel Claudio in the rear seat. After Medina declined the invitation to join his friends, defendant reached under the front passenger seat and displayed what appeared to be a .38 caliber pistol wrapped in a rag. Medina knew the defendant from the neighborhood and selected his photograph from a nine-picture photo array.

At this point in the investigation, Kelly called the Great Lakes Naval Training Station to arrange an interview with defendant. Kelly informed the naval intelligence

agent to whom he spoke that defendant was a suspect in a homicide investigation and had been identified as one of the perpetrators. The agent agreed not only to furnish a room in which Kelly could interview defendant but that the Navy would refrain from informing him of the investigation. Although, at this point, the detective was not of the belief that he had probable cause to make an arrest, upon Kelly's arrival at Great Lakes on July 14, 1980, defendant was brought to the interview room in handcuffs. After Kelly directed removal of the cuffs and told defendant to be seated, he informed him that he was investigating the Rego Park murder of Steven Zwickert, that he was not to say anything until he had been advised of his rights and that the police had reason to believe that he was present when Zwickert was killed. Kelly then advised defendant of his *Miranda* rights and in response was told that defendant understood his rights and that he was willing to speak without an attorney.

In his statement, defendant asserted that after Buck picked him up between 5:30 and 6:00 P.M., the occupants of the car decided to kill some time by driving around and having some beer. At approximately 3:00 to 4:00 A.M., defendant, who was driving the car, was told to park it, and Buck and Angel Claudio departed. After a few moments, defendant heard a noise that sounded like a "backfire". Buck and Angel ran back to the car and said "[l]et [*sic*] get out of here, something happened". Defendant saw them place a gun under the seat and heard Buck say that he should have had the gun since "this kid didn't know how to handle a gun".

After giving this statement, defendant repeated it for stenographic transcription and signed a typed copy in which he acknowledged that he had been advised of his rights. Although presented with the opportunity to correct any errors in the statement, defendant declined to do so. Defendant was then formally arrested and was transported to New York the following afternoon.

Following his indictment, defendant moved to suppress his statements, alleging that they had not been voluntarily made and that they were tainted by an illegal arrest that had not been effected upon probable cause.

During the ensuing hearing, and after Kelly had related the events already described, defendant testified that on the day he was interviewed by Kelly he was taken into custody by two naval intelligence officers who frisked and handcuffed him and then escorted him to the interview room where a civilian ordered the handcuffs removed. On direct examination, defendant twice asserted that he had agreed to give Kelly a statement and that Kelly had read him his rights before he made any statement. When cross-examined, defendant first repeated that he had received his rights before making any statement but then abruptly stated that he had not received his rights until after his initial oral statement.

The hearing court granted suppression after concluding that defendant was under arrest when handcuffed by the naval authorities and brought in for questioning. Apparent from the court's review of the facts and its conclusions of law is reliance on Kelly's subjective belief that the arrest was not based upon probable cause. The court concluded that the defendant's statements were involuntarily given, *Miranda* warnings had not been provided, and the taint of the illegal arrest was not purged.

## II

Pertinent to the determination of the illegal arrest issue are the circumstances of the Navy's production of defendant for his interview with Kelly. Since the Fourth Amendment applies to actions of naval authorities and other governmental employees who have statutory authority to arrest (US Code, tit 10, § 809) or who perform law enforcement or security functions (see *People v Scott D.,* 34 NY2d 483; *Bell v State,* 519 P2d 804 [Alaska]; *Dyas v Superior Ct. of Los Angeles County,* 11 Cal 3d 628), the hearing court properly found that defendant was arrested when naval intelligence agents took him into custody, escorted him to the interview room in handcuffs and placed him in Kelly's presence (see *People v Brnja,* 50 NY2d 366, 372; *People v Gordon,* 87 AD2d 636). Consequently, unless it can be established that there was probable cause for defendant's arrest by the Navy at that time, his subsequent statements must be suppressed as the "poisonous

fruit" of an illegal arrest (see *Wong Sun v United States,* 371 US 471; *People v Gordon, supra*).

The poisonous fruit issue rests in turn on the Navy's authority to arrest defendant on the basis of its communications with Detective Kelly. Under the fellow officer rule, an arresting officer acts with probable cause when he arrests either at the direction of another law enforcement officer who has probable cause or, in the absence of such direction, on the basis of information transmitted from the other officer which itself or together with information already known to the arresting officer establishes probable cause (*Whiteley v Warden,* 401 US 560; *People v Brnja,* 50 NY2d 366, 373, n 4, *supra; People v Lypka,* 36 NY2d 210; *People v Horowitz,* 21 NY2d 55). In recognition of the realities of modern-day law enforcement, the Supreme Court has stressed that law enforcement officers called upon to assist other officers are reasonably entitled to assume that the officers who requested the assistance possessed the requisite information to support the requested action (*Whiteley v Warden, supra,* p 568; see 1 LaFave, Search & Seizure, § 3.5[b]). Therefore, it is unnecessary that the receiving officer possess the requisite information if the action is taken upon the direction of a brother officer who does possess information sufficient to justify the action (*People v Horowitz, supra,* p 60). In this respect, the law does not distinguish between intrastate and interstate police communications and pickup directives as a predicate for police action (*People v Lypka, supra,* p 213).

Directives or requests for action by officer to officer usually occur in the context of formal arrests (see, e.g., *People v Horowitz,* 21 NY2d 55, *supra; People v Loewel,* 50 AD2d 483, 491), but sometimes are made in connection with warrantless searches (see, e.g., *People v Hadley,* 67 AD2d 259, 263), investigative stops (see, e.g., *Commonwealth v Gullick,* 386 Mass 278; *State v Hill,* 3 Ohio App 3d 10), or, as here, with bringing in a suspect for questioning (*State v Whitehead,* 42 NC App 506, app dsmd 298 NC 572; *Dotsey v State,* 630 SW2d 343 [Tex]), an action that constitutes a seizure akin to arrest. In any event, the receiving officer is entitled to assume that the sending officer pos-

sesses the necessary predicate for the requested action without distinction as to the nature of the search or seizure contemplated (see *Dotsey v State, supra,* p 347). To confine the fellow officer rule to directives for arrest in the formal sense would unnecessarily hamper law enforcement officials without providing any meaningful additional safeguards for the rights of individuals and would be inconsistent with the underlying rationale of the rule which recognizes the need for law enforcement officers to seek the assistance of other officers in a variety of situations (see *State v Whitehead, supra*).

Here, it is evident that Kelly's request for assistance contemplated a custodial interrogation. Not only did he inform the naval intelligence agents that defendant had been identified as a perpetrator in a Queens homicide but he also emphasized his desire to interview the defendant alone and that a formal arrest might occur after the interview. While Kelly did not instruct the naval authorities to seize and handcuff the defendant, his request sought an intrusion of similar magnitude — a custodial interrogation which would also require probable cause as a predicate (see *Dunaway v New York,* 442 US 200). Under the fellow officer rule the naval officers were reasonably entitled to assume that the officer issuing the request for the detention of a suspect acted upon probable cause (see *State v Whitehead, supra*). The crucial question then is whether Detective Kelly possessed knowledge sufficient to establish probable cause for an arrest. Since it is obvious that Criminal Term's conclusions were based in part on Kelly's belief that he lacked such probable cause at the time he requested defendant's production for interview, we must determine whether the subjective evaluation of the arresting (or interrogating) officer must prevail over objective judicial determination of the facts in existence and known to the officer.

### III

How a police officer's state of mind affects the validity of a search or seizure has become a principal focus of recent debate centering on whether a "good-faith" exception to the exclusionary rule should be established (see, e.g., The Exclusionary Rule Revisited: Good Faith in Fourth

Amendment Search and Seizure, 70 Ky L J 879; The Fourth Amendment Exclusionary Rule: The Desirability of a Good Faith Exception, 32 Case W Res L Rev 443; LaFave, The Fourth Amendment in an Imperfect World: On Drawing "Bright Lines" and "Good Faith", 43 U Pitt L Rev 307; Comment, Exclusionary Rule: Good Faith Exception — The Fifth Circuit's Approach in *United States v. Williams,* 15 Ga L Rev 487; Ball, Good Faith and the Fourth Amendment: The "Reasonable" Exception to the Exclusionary Rule, 69 Crim L & Criminology 635). As of this date the Supreme Court has not adopted a good-faith exception although it recently granted review in three cases addressing the issue (see *Massachusetts v Sheppard,* __ US __, 51 USLW 3913; *Colorado v Quintero,* __ US __, 51 USLW 3913; *United States v Leon,* __ US __, 51 USLW 3914) after abjuring an earlier opportunity to meet it (see *Illinois v Gates,* 462 US __, 51 USLW 4709). The good-faith exception would permit an officer's good faith to rehabilitate an otherwise unconstitutional search or seizure, a result that arguably might undermine the deterrent effect of the exclusionary rule (see brief *amicus curiae* of American Bar Association, *Illinois v Gates, supra*). Whatever the ultimate resolution of the good-faith question, the People do not rely on good faith since they argue that the defendant's interrogation was constitutionally proper and that deterrence of Fourth Amendment violations would be entirely unserved by suppression. There is no requirement for symmetry between cases where an arrest is based on an officer's mistaken belief that probable cause exists and those where the arrest is made in the face of a mistaken belief that no probable cause exists. Analysis of each situation should proceed independently in light of the effect of the exclusionary rule (see Burkoff, Bad Faith Searches, 57 NYU L Rev 70, 72).

The two major justifications for the exclusionary rule are the imperative of judicial integrity and deterrence of future unlawful conduct of police officers (*United States v Peltier,* 422 US 531; *Elkins v United States,* 364 US 206). Where a police officer objectively possesses enough information to establish probable cause but simply does not realize it when the arrest is made, there is no improper

police conduct warranting invocation of the deterrent action of suppression. In such a circumstance, judicial approval of the search or seizure cannot be construed as sanctioning unlawful conduct (see Burkoff, Bad Faith Searches, 57 NYU L Rev 70, 93-94; 1 LaFave, Search & Seizure, § 1.2[g], 1983 Pocket Part; Amsterdam, Perspectives on the Fourth Amendment, 58 Minn L Rev 349, 372-374) and the judicial message to the officer who mistakenly believed he lacked probable cause to effect an arrest is that he did have proper grounds to arrest, "a message which would be muddled at best if the arrest in that case were deemed to necessitate exclusion of evidence" (1 LaFave, Search & Seizure, p 19, 1983 Pocket Part). Since the exclusionary rule is a mechanism by which it is sought to achieve the Fourth Amendment objective of preventing unreasonable searches and seizures, it is difficult to justify depriving the Government of relevant and reliable evidence as the result of a search or seizure that the officer was constitutionally permitted to make (Amsterdam, Perspectives on the Fourth Amendment, 58 Minn L Rev 349, 437). Attaching exclusionary sanctions to proper conduct as a deterrent to police officers contemplating improper conduct has been characterized as "hopelessly misguided" (Burkoff, Bad Faith Searches, 57 NYU L Rev 70, 94, n 120).

Furthermore, to permit the officer's legal opinion concerning the existence or nonexistence of probable cause to control the constitutionality of an arrest contravenes a basic principle of current Fourth Amendment jurisprudence, for the courts rather than the police must determine probable cause (see *Coolidge v New Hampshire,* 403 US 443; *Johnson v United States,* 333 US 10, 14; Burkoff, Bad Faith Searches, 57 NYU L Rev 70, 95). Just as the policeman is not the ultimate judge of the sufficiency of the facts and circumstances then known to him, he ought not be the judge of their insufficiency (*United States v Rowell,* 612 F2d 1176, 1179). Not only does the subjective approach place a premium on dissemblance, but the difficulty of administering a standard which turns upon motivation would approach futility and would produce a fruitless allocation of judicial resources (*United States v Arra,* 630

F2d 836, 845, n 12; Amsterdam, Perspectives on the Fourth Amendment, 58 Minn L Rev 349).

The leading case on the subject is *Scott v United States* (436 US 128), which decided whether an officer's improper motives affected the constitutionality of an otherwise constitutional search. Scott argued that FBI agents had not complied with the mandate to minimize their telephone interceptions by listening solely to calls colorably connected with criminal activity (see US Code, tit 18, § 2518, subd [5]). Writing for the court's majority, Justice REHNQUIST adopted the Government's position that the existence of a constitutional violation must turn on "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time" and that subjective intent alone did not make otherwise lawful conduct illegal (*Scott v United States, supra,* p 136). The *Scott* court thus determined that whether the agents violated the Fourth Amendment must be determined by using "a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved" (p 138).

The Scott view has been indorsed under the Constitutions of several of our sister States (see, e.g., *State v Vaughn,* 12 Ariz App 442; *Thomas v State,* 395 So 2d 280 [Fla]; *Cuevas v State,* 151 Ga App 605; *Grimes v State,* 412 NE2d 75 [Ind]; *State v Heitman,* 589 SW2d 249 [Mo]; *State v Peck,* 305 NC 734), but New York's Court of Appeals has not directly addressed whether an otherwise proper arrest is undermined by the arresting officer's erroneous subjective belief that probable cause was lacking. In some earlier contexts, however, the Court of Appeals has expressed a preference for an objective standard. Thus, an arrest based upon a warrant retained in a criminal justice system computer was held invalid because the warrant had in fact become inapplicable, notwithstanding the People's claim that the arresting officer acted in good faith (see *People v Jennings,* 54 NY2d 518). According to the *Jennings* court (p 523), "[a]n assessment of probable cause turns on what was reasonably and objectively in the mind of law enforcement authorities. It does not turn on such subjective considerations as the absence of malice against a suspect, the

lack of intent to violate constitutional rights * * * or any other variation of * * * the 'white heart and empty head' standard". Furthermore, an officer's reliance on the asserted authority of an individual to consent to a search of an apartment must be based upon an objective view of the circumstances present and not upon the subjective good faith of the officer (*People v Adams,* 53 NY2d 1, 9).

We do not view *People v Harrison* (83 AD2d 965, affd 57 NY2d 470) as bearing on the question before us, even though the *Harrison* dissenter in this court argued that in deciding that suppression was required, the majority was relying on the officer's mistaken belief that he had no probable cause for arrest. But on further appeal the Court of Appeals — by footnote reference — concluded that mistaken belief was not a factor in the Appellate Division determination because the officer in question had never observed the hanging license plate that might have provided probable cause (57 NY2d, at p 473, n 1).

Our conclusion is obvious — the twin policy considerations underlying the exclusionary rule, deterrence and judicial integrity, are not served if law enforcement officials are deprived of relevant evidence when an objective assessment of the facts justifies the actions taken. Furthermore, the legality of an arrest must be independently determined by the courts upon the actual facts and circumstances known to the officer (*Scott v United States,* 436 US 128, *supra*).

## IV

Having concluded that his subjective belief as to the existence of probable cause is not dispositive, we must still decide whether Kelly actually possessed probable cause to believe that the defendant had committed a crime. In that connection, the crucial issue is whether Kelly was entitled to rely on his informant's tip. In *Illinois v Gates* (462 US __, 51 USLW 4709, *supra*), the Supreme Court abandoned the long-standing "two-pronged test" enunciated in *Aguilar v Texas* (378 US 108) and substituted a "totality of the circumstances" analysis which includes consideration of the *Aguilar* prongs of "veracity" and "basis of knowledge" as part of a totality but not as the sole and separate tests. Thus, in determining the reliability of a tip, a deficiency in

one prong may be compensated for by a strong showing as to the other or by some other indicia of reliability (*Illinois v Gates, supra,* p __, p 4714). Although our State standard for evaluating the legality of warrantless arrests predicated upon data from an informer has generally paralleled the *Aguilar* test (see, e.g., *People v Rodriguez,* 52 NY2d 483; *People v Elwell,* 50 NY2d 231; *People v Wirchansky,* 41 NY2d 130), it is unnecessary for us to consider whether the more stringent "two-pronged test" remains in effect as a matter of State constitutional law.* The circumstances of this case make it clear that under either test the informant's tip was properly relied upon by Detective Kelly. The "veracity" and "basis of knowledge" prongs were sufficiently demonstrated, whether as separate or intertwined requirements, since the informant's tip was based on facts that he personally witnessed (*People v Rodriguez, supra,* p 491; *People v Brown,* 40 NY2d 183, 186), and important details of his story — the naming of two perpetrators — had already been confirmed by the police in their independent investigation (*People v Rodriguez, supra,* p 490; *People v Coffey,* 12 NY2d 443, cert den 376 US 916). On the basis of Medina's information, including the defendant's display of what appeared to be a .38 caliber weapon, Detective Kelly had probable cause to believe that defendant had committed the crime of criminal possession of a weapon (see Penal Law, § 265.00 *et seq.*).

V

The final issues concern the voluntariness of the defendant's statements and the timeliness of the *Miranda* warnings he received.

On voluntariness, Criminal Term concluded that the People failed to prove that the defendant's statements were voluntarily given since the defendant "merely submitted to the authority of the Navy and then that of the detective". This conclusion is not supported by the record. In evaluating the "totality of the circumstances" (see *Clewis v Texas,* 386 US 707, 708; *Fikes v Alabama,* 352 US 191, 197; *People v Anderson,* 42 NY2d 35, 38), we are satisfied that defen-

---

* Indeed, the Court of Appeals recently reapplied the *Aguilar* test and declared it had no occasion to consider the effect of *Illinois v Gates* (462 US __, 51 USLW 4709) on the State rule (*People v Landy,* 59 NY2d 369).

dant made the challenged statements of his own free will. The record on appeal is devoid of any indication that he was subjected to an intensive or prolonged interrogation (see *People v Anderson, supra*) and the atmosphere of the encounter cannot be characterized as either hostile or coercive (cf. *People v Anderson, supra; People v Leonard,* 59 AD2d 1). Thus, under prevailing criminal justice standards, the statements were voluntarily given.

What remains is whether defendant received *Miranda* warnings prior to interrogation. In its determination, Criminal Term stated that "the People have failed to show that defendant knowingly, intelligently and voluntarily waived his Fifth Amendment rights" and that "the defendant was apprehended and subjected to in-custody interrogation without proper warnings or a purging of the primary taint of the illegal arrest. See *Brown v Illinois,* 422 U.S. 590". Although Criminal Term emphasized the illegality of the arrest and the involuntary nature of the statements, its brief reference to *Miranda* warnings resolved the disputed factual question as to whether they were timely given (*Janowitz Bros. Venture v 25-30 120th St. Queens Corp.,* 75 AD2d 203, 210). Unfortunately, that portion of the determination was unaccompanied by any explanation as to why the court believed defendant's version of the *Miranda* warning facts as opposed to Detective Kelly's. The People now argue that Criminal Term's conclusion was against the weight of the evidence, considering defendant's twice-made concession during direct testimony that he had received timely *Miranda* warnings, his signed statement acknowledging receipt of the warnings, his unexplained retraction of his earlier *Miranda* testimony on cross-examination, and the absence of any reason to discredit Kelly's testimony.

In reviewing a factual determination based largely upon an assessment of credibility, the determination of the trier of facts is ordinarily accorded great weight (*Amend v Hurley,* 293 NY 587, 594; *People v Samuels,* 68 AD2d 663, affd 50 NY2d 1035; *People v Atlas,* 183 App Div 595, 600). However, this rule of deference must give way when the appellate court determines that the fact findings under review are against the weight of the evidence (*People v*

*Smith,* 93 AD2d 432; *People v Mendez,* 75 AD2d 400; *People v Newson,* 68 AD2d 377), which is itself a factual determination (*Cohen v Hallmark Cards,* 45 NY2d 493). If the determination is made after a Bench trial and the Appellate Division finds that the trier of fact incorrectly assessed the evidence, the Appellate Division has the power to make new findings of fact (CPL 470.15, subd 1; *People v Acosta,* 74 AD2d 640; *People v Russo,* 45 AD2d 1040; see, also, CPLR 4404, subd [b]). Weight of evidence analysis involves a discretionary balancing of many factors based upon the court's commonsense reaction to the evidence, in light of its collective experience (see *Cohen v Hallmark Cards, supra,* p 499; *Mann v Hunt,* 283 App Div 140). If a different finding from that of the trial court is not unreasonable, then this court must weigh the relative probative force of conflicting testimony and the relative strength of any inferences that may be drawn from such testimony (*People ex rel. MacCracken v Miller,* 291 NY 55, 62; *Larkin v State of New York,* 84 AD2d 438; *Shipman v Words of Power Missionary Enterprises,* 54 AD2d 1052).

Although we recognize the advantage possessed by the hearing court which saw and heard the witnesses, in light of the peculiarities of this case we cannot agree with its conclusion that timely *Miranda* warnings were not given (see *Lynch v Repetti,* 94 AD2d 790; *Matter of Department of Social Servs. v Hector S.,* 81 AD2d 915). To begin with, defendant's moving papers never even raised a *Miranda* issue but relied instead on claims of coercion and submission to authority. At the hearing, Kelly testified that at the outset of the interview he informed defendant of his rights. That testimony was clearly and unequivocally corroborated by defendant who twice stated on direct examination that he had waived his rights prior to making any statement. Upon cross-examination, he initially confirmed his prior testimony concerning the waiver but suddenly contradicted those admissions by stating that he had not been given his rights until after he had given his first statement. Not only had the *Miranda* issue been unraised until this point in the hearing, but neither the hearing court nor the defendant has articulated any reasonable basis for discrediting the testimony of Detective Kelly who had been

candid enough to reveal his negative view of the presence of probable cause. On this record we find that Criminal Term's factual determination that *Miranda* warnings were not given prior to the defendant's first statement to be contrary to the weight of the evidence. In the exercise of our own fact-finding power, we find that the defendant received his *Miranda* rights in a timely fashion.

Accordingly, the order granting suppression of defendant's statements should be reversed and the defendant's motion to suppress denied in its entirety.

DAMIANI, J. P., MANGANO and GIBBONS, JJ., concur.

Order of the Supreme Court, Queens County, dated March 26, 1981, reversed, on the law and the facts, defendant's motion to suppress denied in its entirety and matter remitted to Criminal Term for further proceedings.