OPINION OF THE COURT
Jerome Becker, J.
This decision supplements a decision dictated into the record on January 10, 1979, at the conclusion of a fact-finding hearing in the above-captioned matter.
Adoption proceedings, and proceedings to free children for adoption, were unknown at common law (Matter of Malpica-Orsini, 36 NY2d 568, 570; Matter of Anonymous, 40 NY2d 96, 101). These proceedings exist solely by statute. Statutes in derogation of common law must be strictly construed (McKinney’s Cons Laws of NY, Book 1, Statutes, § 311).
Against this background, the court will now proceed to examine the issues presented in this case.
On November 23, 1977, the petitioner instituted a guardianship and custody proceeding pursuant to section 384-b of the Social Services Law alleging failure to plan for the future of Roxann M., by the respondent parents, Claire M. and Nicholas M. (see Social Services Law, § 384-b, subd 7, par [a]).
Roxann, born March 14, 1968, was voluntarily placed by the natural parents with the Commissioner of Social Services on May 8, 1968. Most foster care placements are voluntary. They occur when physical or mental illness, economic problems or other family crises make it impossible for the natural parents to provide a stable home life for their children for some limited period. Resort to placement is almost compelled when it is not possible in such circumstances to place the child with a relative or friend or to pay for the services of a homemaker or a boarding school. Inability to care for Roxann compelled the M.’s to resort to placement. At the time, however, they did not envisage that a "limited time” would be almost 11 years.
Roxann, almost 11 years old, is a bright, articulate youngster who exhibits a maturity far beyond her age. Since infancy *393 she has resided with the same foster family, and her foster parents wish to adopt her.
Voluntary placement requires the signing of a written agreement by the natural parent or guardian, transferring the care and custody of the child to an authorized child welfare agency. ("Authorized agency” is defined in Social Services Law, § 371, subd 10.) By statute the terms of such agreements are open to negotiation (Social Services Law, § 384-a, subd 2, par [a]). However, more frequently the agencies require execution of standardized forms. Herein, respondents signed a standardized form.
Before reaching the question of whether or not the respondent parents failed to substantially plan for the future of their «child, a more fundamental question concerning procedural due process must be resolved. The question is: Were these respondent parents given notice of their duty to plan for the future of their child and the consequences should they fail to do so— i.e., termination of their parental rights?
Before proceeding to a resolution of that issue, a brief historical analysis of permanent neglect proceedings is warranted.
HISTORICAL ANALYSIS
Prior to the 1973 amendment to section 614 of the Family Court Act (L 1973, ch 870), an adjudication of permanent neglect could not be made unless the petitioner proved a failure of the parents both to "maintain contact” and to "plan for the future of the child”. Arguably, parental rights were safeguarded by the definiteness of the "maintain contact” requirement which afforded parents sufficient notice of their obligations in order to avoid termination of parental rights. However, the 1973 amendment to the statute substituted "or” for "and”. This change from the conjunctive to the disjunctive, as interpreted by the Court of Appeals in Matter of Orlando F. (40 NY2d 103), permits an adjudication solely on the basis of failure to plan, irrespective of the qualitative and quantitative substantiality of continued contacts with the child by the parents. Thus, the duty to plan was made a separate and distinct obligation.
OPINION
Too often, custodial agencies create unintentional legal *394 traps for parents — either by acts of commission or omission. Seemingly, an act of omission is the root of the problem in the instant case.
In part, these traps arise because the parties involved in a voluntary placement are not dealing with one another on an equal basis. "The parent is * * * saddled with problems: economic, physical, sociological, psychiatric, or any combination thereof. The agency in contrast is vested with expertise, experience, capital, manpower and prestige. Agency efforts correlative to their superiority are obligatory.” (Matter of Sydney, 84 Misc 2d 932, 934.) Unless they are told, how many parents voluntarily placing their child are aware that if they do not adequately plan for the return of the child they stand to lose their invaluable parental rights forever? Very few, I* dare say.
Yet it is settled law that the Fourteenth Amendment requires that a defendant charged with a crime be read his Miranda rights. By analogy, a parent who places a child should be entitled to similar safeguards. That parent, too, should be read his or her visitation and planning obligations regarding the child. This oral recitation and explanation, which the court designates "Roxann rights”, should be given by a competent representative of the agency to the parent. The recitation should be given in English and a second language when necessary. After the reading of the "Roxann rights,” the parent should be carefully questioned to insure that he or she understands his or her duties and obligations.
NOTICE
The respondent father was not given notice of a statutory duty to plan for the future of his child (Family Ct Act, § 614; Social Services Law, § 384-b, subd 7, par [a]). This constituted an abridgment of his due process rights.
There is little doubt that the due process clause of the Fourteenth Amendment is offended by the failure of the agency to advise the respondent of his duty to plan for the future of his child and the consequences of his failure to do so. Exacting procedural safeguards are a necessity when parental rights are sought to be interfered with, as those rights have long been recognized and fervently guarded (Matter of Cardinal, 30 AD2d 444; Stanley v Illinois, 405 US 645). Moreover, notice requirements guaranteed by the Fourteenth Amend *395 ment have been extended to parental termination proceedings (see Alsager v District Ct. of Polk County, Iowa, 406 F Supp 10).
A cursory review of the W-864 form signed by the parents reveals that only the duty to "visit the child” and the consequences should the parents fail to do so is mentioned. Nowhere in the form, executed when the law was more stringent and required both a failure to maintain contact and a failure to plan before termination, is there mention of the duty to plan.* No explanation was given about why the more obvious and more easily understood requirement (maintain contact) is contained in the agreement while the more vague requirement (plan for the future of the child) is omitted. The silence of the agreement on this issue is ringing and condemning. Seemingly, a parent voluntarily placing a child would realize that he or she must "visit the child”, but he or she may not realize that he or she must formulate a plan for the future of the child.
As composed, the subject agreement presents difficulties for one unfamiliar with "legalese”. The intent of the printed agreement should be to apprise the parent of his or her responsibilities regarding the child, as well as the responsibilities of the agency. It need not be an instrument fraught with legal technicalities and terminology foreign to parents. Rather, it should be an easily understood instrument containing lay terms (Social Services Law, § 384-a, subd 2, par [c]).
section 384-a of the social services law
Recognizing the pitfalls inherent in voluntary placements, the Legislature enacted section 384-a of the Social Services Law (L 1975, ch 710). Shortly thereafter, section 384-a was amended to provide that in all voluntary placements parental rights and obligations be enumerated at the time of placement, and that these rights could not later be curtailed without court order (L 1976, ch 669). The memorandum of Assemblyman Gottfried offers some insight into the legislative intent of the amendment. Commenting on foster care placements he noted, inter alia:
"This bill attempts to correct this situation [long-term foster care] in two ways: first, by amending section 384 of the S. S. L. to stipulate that the instrument the parent signs when plac *396 ing a child clarifies specific parental and agency responsibilities, particularly concerning visitation.
* * *
"It is essential that at the outset of á placement, when the family’s interest and motivation to plan for the child are highest, that attention be given to assuring that alternatives to placement have been explored, and that if placement is needed the parent(s) of the child understand their responsibilities (including visiting, keeping the agency informed of their whereabouts, contributing to support where able.)” (NY Legis Ann, 1976, p 262.)
As Mr. Gottfried observed, "it is important, since parental rights can be terminated, that parents placing a child be fully cognizant of their rights and responsibilities to the child in care.” (NY Legis Ann, 1976, p 263.) Thus, that which was implicit in 1968 is now explicit.
Section 384-a of the Social Services Law provides, in relevant part:
"(c) The instrument, or a separate statement appended thereto, shall include a recitation, in lay terms, advising the parent or guardian: * * *
"(iii) that the parent or guardian, subject to the terms of the instrument, has an obligation
"(A) to visit the child,
"(B) to plan for the future of the child,
"(C) to meet with and consult the agency about such plan,
"(D) to contribute to the support of the child to the extent of his or her financial ability to do so, and
"(E) to inform the agency of any change of name and address;
"(iv) that the failure of the parent or guardian to meet the obligations listed in subparagraph (iii) could be the basis for a court proceeding for the commitment of the guardianship and custody of the child to an authorized agency”.
The standardized form frequently used today by the agencies reflects these statutory requirements. However, as an additional safeguard, this court strongly recommends an oral recitation and explanation, which the court has designated "Roxann rights”.
Two additional safeguards come to mind. First, the agency should provide the parents with the booklet prepared by the *397 Bureau of Child Welfare, which details the obligations of parents of children in foster care. (See The Parents’ Handbook: A Guide for Parents of Children in Foster Care, the Bureau of Child Welfare, Jan., 1977.) Second, an oral recitation and an explanation of the parents’ obligations should be given by the court upon an extension of placement. A foster care review hearing is statutorily mandated (Social Services Law, § 392), and if the court enters an order of disposition directing that foster care be continued (Social Services Law, § 392, subd 7, par [a]), it should warn the parents of how the guillotine may cut off their rights should they fail to maintain contact or to plan for the future of their child(ren).
DUE PROCESS
 "[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight’ but to the nature of the interest at stake * * * We must look to see if the interest is within the Fourteenth Amendment’s protection of liberty and property” (Board of Regents v Roth, 408 US 564, 570-571). Thus, the initial inquiry must focus upon the interest which respondent seeks to protect — the integrity of his family.
The right to the integrity of the family is among the most fundamental rights under the Fourteenth Amendment (Stanley v Illinois, 405 US 645, supra; Prince v Massachusetts, 321 US 158; Pierce v Society of Sisters, 268 US 510; Meyer v Nebraska, 262 US 390). Termination proceedings strike at the very core of this right. They may result in the severance of the most basic human relationship — the parent-child relationship.
Having reached the inescapable conclusion that there is a legally recognizable interest to which the due process requirement of the Fourteenth Amendment attaches, the court must now determine whether or not the procedures employed in this case satisfy the requirements of due process. The Supreme Court in Smith v Organization of Foster Families (431 US 816, 847), wrote: "Where procedural due process must be afforded because a 'liberty’ or 'property’ interest is within the Fourteenth Amendment’s protection, there must be determined 'what process is due’ in the particular context.” "[D]ue process is flexible and calls for such procedural protection as the particular situation demands” (Morrissey v Brewer, 408 US 471, 481).
*398 "[identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail” (Matthews v Eldridge, 424 US 319, 335). Consideration of the procedures employed by the petitioner in this particular case in light of these three factors compels the conclusion that those procedures violated constitutional standards.
First, the procedure applicable here consisted of having the respondents, who wished to voluntarily place their child in foster care, sign a standardized form. The instrument did not advise respondents of their responsibility to plan for the future of their child, and it did not warn them that failure to plan for the future of the child could result in proceedings to terminate parental rights. At the time this instrument was executed (May 8, 1968), it was necessary to show that both requirements (to maintain contact and to plan) had not been met in order to terminate parental rights on the ground of permanent neglect. The instrument itself is silent on the issue of planning, and nowhere in this 45-page petition is it alleged that respondents were advised orally that if they did not make plans for the child that a permanent neglect proceeding would be instituted against them. The respondent father testified that "someone” from the agency visited him in 1968 to obtain his signature on the placement form. According to Mr. M., he never read the form. His uncontroverted testimony revealed that the signing of the agreement was treated in a cavalier and perfunctory manner.
Although the instrument failed to advise the respondent of his duty to plan, it did advise him of his obligation to "visit the child”. That he did. (The court notes that the respondent mother also visited.) Since the respondent testified that he did not read the form, it is unclear whether he visited the child because he was advised orally of his obligation to visit and the consequences of his failure to do so or because he genuinely wanted to visit the child.
At the outset, this agency erred. As previously noted, the constitutional liberty sought to be protected by this procedure *399 is the right to the integrity of the family. Consideration of this interest to be protected and the likelihood of erroneous deprivations, the first two factors enumerated in Matthews v Eldridge (supra) as appropriate in determining the sufficiency of procedural protections, support a finding that this standardized form should have also advised about the statutory requirement of planning for the future of the child. Likewise, it should have advised respondents about the consequences of failing to plan. In consideration of the third factor enumerated in Matthews, suffice it to say that the printing of one or two additional sentences would have imposed a miniscule, if any, administrative or fiscal burden on the agency.
DILIGENT EFFORTS
Respondents urge a second ground for dismissal. They contend that the agency has failed to meet its statutory mandate of "diligent efforts” (Social Services Law, § 384-b, subd 7, par [a]). "Diligent efforts” are "reasonable attempts by an authorized agency to assist, develop and encourage a meaningful relationship between the parent and child including but not limited to: (1) consultation and cooperation with the parents in developing a plan for appropriate services to the child and his family”. (Social Services Law, § 384-b, subd 7, par [f], cl [1].) Implicit in this definition is the responsibility of the agency to afford a parent a careful, intelligent recitation of the law regarding the responsibilities of the parents and the agency as well as the consequences of the parents’ failure to fulfill their responsibilities. No such recitation was given this respondent. Thus, this court finds that the action of the agency (more aptly termed "inaction”) falls short of the statutory requirement of diligent efforts when considered in light of the facts.
At this time the court need not pass on the merits of the allegations contained in this voluminous petition. In this age of expanding concepts of due process and the fundamental constitutional nature of the rights discussed herein, no argument can be made that an adjudication of permanent neglect can be sanctioned in the absence of the full panoply of procedural protections guaranteed by the due process clause of the Fourteenth Amendment. Hence, this petition is dismissed.

 The respondent mother was absent on this date.