OPINION OF THE COURT
Bruce M. Kaplan, J.
This proceeding marks the third time that the petitioner, The Jewish Child Care Association (JCCA), has sought to terminate the parental rights of Elaine S. Y. as to her daughter, Suzanne Y. The suffering and despair that this litigation has wrought renders it a sad commentary on the workings of our system of justice.
The court first obtained jurisdiction over this matter as a result of a neglect proceeding filed against Mrs. Y. This resulted in a finding of neglect, and placement of Suzanne with the Commissioner of Social Services in a foster home under the supervision of JCCA.
JCCA then filed a petition on September 16, 1974 to terminate the parental rights of Mrs. Y. based upon permanent neglect alleging that she failed to plan for the future of Suzanne. At an inquest, Suzanne was adjudicated permanently neglected. After a dispositional hearing, Mrs. Y.’s parental rights were terminated and Suzanne was adopted by her foster parents.
Subsequently, Mrs. Y. moved to vacate the default. Her motion was denied. She successfully appealed to the Appellate Division, which vacated the default, and ordered a new trial.
On November 21, 1977, Honorable Stanley Gartenstein terminated parental rights pursuant to a principle of "no-fault” termination. (Matter of Suzanne Y., 95 Misc 2d 733.) His sensitive and thoughtful decision held that although JCCA had failed to make a prima facie case based on statutory grounds, parental rights should be terminated in the best interests of the child. He postulated that this holding was a logical outgrowth of Matter of Bennett v Jeffreys (40 NY2d 543).
On December 21, 1978 the Appellate Division, First Department, reversed the order terminating parental rights, and remanded the matter for a new trial. The court relying on Matter of Corey L v Martin L (45 NY2d 383) held that termination of parental rights can only be based upon the grounds articulated in section 384-b of the Social Services Law, and that the "best interests” test enunciated in Matter *217 of Bennett v Jeffreys (supra) is not applicable to proceedings to terminate parental rights. (Matter of Suzanne N. Y., 66 AD2d 723.) This conclusion became unassailable when the question was squarely considered by the Court of Appeals in Matter of Sanjivini K. (47 NY2d 374). It unequivocally held that only statutory grounds can suffice to terminate parental rights.
The Appellate Division remanded this case to the Family Court stating, inter alla, "But we think that the interests of everyone will be better protected by our adhering to procedural regularity, by not attempting as an appellate court to try to make the findings of fact which a trial court seeing and hearing the witnesses and the parties is so much better able to do, especially where so much depends on a judgment as to the personalities, abilities, emotions and actions of the parties.” (Matter of Suzanne N. Y., 66 AD2d 723, 724.)
The expectations of the Appellate Division were destined to be unrealized. In the trial held before this court petitioner presented only such testimony as was necessary to qualify the agency’s records for Suzanne for admission into evidence through a supervisor who had no personal knowledge of the case.
In addition respondent, on consent, introduced the transcript of the September, 1977 trial before Judge Gartenstein. Ironically, this court was left no better able to make a "judgment as to the personalities, abilities, emotions and actions of the parties” than was the Appellate Division when this very same evidence was considered by it in October of 1978.
In order to prevail, petitioner must prove permanent neglect by a preponderance of the credible evidence. Its burden is one of constitutional magnitude. (Matter of Corey L v Martin L, supra.) This court holds that it failed to meet this burden. Accordingly, the petition must be dismissed.
The elements of permanent neglect are set forth in section 384-b (subd 7, par [a]) of the Social Services Law which states: Permanent neglect is a failure for a period of more than one year following placement, "substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency’s diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child.”
To plan for the future of the child means to take such steps *218 as may be necessary to provide an adequate stable home, and parental care for the child within a period of time which is reasonable under the financial circumstances available to the parent. (Social Services Law, § 384-b, subd 7, par [c].) Such a plan must be realistic and feasible. (Matter of Orlando F., 40 NY2d 103.)
The testimony in the prior hearing indicates a genuine desire on the part of Mrs. Y. to have Suzanne returned to her. She searched for a larger apartment in anticipation of Suzanne’s return. She attended therapy sessions consistently, in a sincere attempt to ameliorate her mental health. Such actions may constitute planning by conduct. (See Matter of Sydney, 84 Misc 2d 932.)
Furthermore, the failure to formulate a feasible and realistic plan does not in and of itself constitute permanent neglect. Respondent clearly required help to encourage and strengthen her relationship with Suzanne, and under the statute’s mandate was entitled to receive it unless that were to prove detrimental to Suzanne’s best interests.
The efforts expected of the agency include the investigation of financial problems of the parent, the formulation of viable proposals, suggestions as to the development of a plan for services, informing the parent as to the child’s progress, as well as arrangements for visitation. (Matter of Anita "PP”, 65 AD2d 18; Social Services Law, § 384-b, subd 7, par [f].)
The requirement of diligent efforts stems from both the nature of the proceeding, and the relative positions of agency and parent. The proceeding constitutes an interference by the State in the parent-child relationship. In this setting, the parent is severely disadvantaged, being burdened with economic, emotional, mental and physical problems. On the other hand, the agency "is vested with expertise, experience, capital, manpower and prestige. Agency efforts correlative to their superiority [are] obligatory.” (Matter of Sydney, supra, p 934; Matter of Joyce Ann R, 82 Misc 2d 730; Matter of Santosky, 89 Misc 2d 730.)
It is incumbent upon the agency to take steps to attempt to strengthen the bond between parent and child, except where doing so would contravene the child’s best interests. The first step that the agency must take is to inform the parent in a manner simply stated, and strongly urged, of his or her responsibilities with respect to the child, and the agency. It must emphatically bring home to the parent in terms he or *219 she is capable of comprehending that the failure to plan for his or her child may result in the dire consequence of the irrevocable loss of his or her child. This obligation was held implicit in the statutory definition of "diligent efforts” by Honorable Jerome M. Becker in Matter of Roxann Joyce M. (99 Misc 2d 390). His reasoning is apposite here.
In that case Judge Becker refused to terminate parental rights. He held that the agency breached its obligation to inform the respondent father of his obligation to plan for Roxann’s return, or what the consequences would be if he failed to do so. Judge Becker noted that there was no proof that the agency had advised him of his obligation to plan. He also noted that the surrender instrument was silent on this issue, no oral explanations were tendered, nor, apparently, was he provided with a copy of "The Parents’ Handbook”, A Guide for Parents of Children in Foster Care published by the Department of Social Services’ Special Services for Children Unit.
He found that the agency’s omission to advise respondent constituted an unconstitutional deprivation of due process, as well as a failure to comply with its duty under subdivision 7 of section 384-b of the Social Services Law.
While this court agrees with the reasoning that bottomed Judge Becker’s conclusion that the agency’s actions were unconstitutional, nonetheless it respectfully declines to follow that portion of the decision.
As recently stated by the First Department in Matter of Dora P. (68 AD2d 719, 729) "It is a cardinal tenet of our law that constitutional questions should not be reached unless there is need for their determination to resolve the issue at hand and the question is squarely presented (Comiskey v Arlen, 43 NY2d 696; Matter of Peters v New York City Housing Auth., 307 NY 519; Anti-Fascist Committee v McGrath, 341 US 123).”
In addition, section 150 of McKinney’s Statutes (McKinney’s Cons Laws of NY, Book 1) provides that a statute should not ordinarily be set aside as unconstitutional by a court of original jurisdiction unless such conclusion is inescapable. (People v Mason, 99 Misc 2d 583.)
Since the decision could have rested solely on statutory grounds it was unnecessary to reach the constitutional issue.
While that case involved a voluntary placement, the statute *220 makes no distinction between a parent who makes a voluntary placement, and a parent who has neglected his or her child with respect to an agency’s obligation to make diligent efforts to encourage and strengthen the parental relationship.
Accordingly, not only did JCCA have the obligation to consult with Mrs. Y. in developing a plan for appropriate services to the child and her family (Social Services Law, § 384-b, subd 7, par [f], cl [1]) but also to advise her that her parental rights could be terminated if she failed to plan.
The agency’s statutory responsibility under section 384-b of the Social Services Law, both implicit and explicit, has been set forth.
We must now examine the record to ascertain how JCCA comported with its legal obligations.
At the outset it must be observed that the petitioner’s case was presented in a sparser manner than the proceeding conducted by Judge Gartenstein.
The only testimony adduced was that of a casework supervisor who lacked personal knowledge of the case. Her purpose was to lay the appropriate foundation for the introduction of a three-folio case record into evidence.
This method of proceeding deprived this court of the opportunity to determine credibility through observing the demeanor of witnesses giving testimony. (People v Samuels, 68 AD2d 663.) It denied this court, as the trier of fact, the opportunity to consider the appearance, attitude, and demeanor of witnesses in testing veracity, and determining the weight to be accorded their testimony. (Matter of Nowakowski, 284 App Div 655, 657, affd on rearg 1 AD2d 250, 252, affd 2 NY2d 618; People v Carter, 37 NY2d 234.)
The Court of Appeals has recently re-emphasized the especial importance in child custody, visitation or neglect proceedings that appropriate factual findings be made by the trial court — the court best able to measure the credibility of witnesses (Matter of Jose L. I., 46 NY2d 1024, 1026) and that the greatest respect be accorded the nisi prius court where assessments of the credibility of witnesses are made. (Matter of Irene O., 38 NY2d 776.)
That is nigh on impossible where there are no live witnesses testifying on the central issues involved.
Mr. Eibel’s cross-examination surfaced some telling points. The entries in the case record for the period May 16, 1972 *221 through June 2, 1972 were transcribed by an unidentified person four days after their dictation by caseworker Rebecca Cauman. Her rough notes were not available, nor was any explanation forth coming on who made the numerous penciled entries in the case record, or for what purpose they were made.
In addition it was established that Rebecca Cauman, Paula Ainsley and Beatrice Greenfield, three persons who previously had contributed crucial entries to the case record, were not called to testify even though they still were employed by JCCA.
The agency’s failure to call them was not satisfactorily explained, and works a substantial dimunition of the weight to be accorded the case record.
While there is no doubt that it is admissible, the court is aware that its reliability is suspect, for as Judge Gartenstein observed, it is replete with hearsay piled on hearsay. (See Matter of Leon RR, 48 NY2d 117.)
The casework entry of July 18, 1974 exemplifies why this conclusion is warranted. It states: "At one point she [respondent] denied knowing about the need for planning, and I confronted her with the fact that I had been present at such a discussion, (signed) B. G. (Transcribed) 7/31/74”.
An examination of the record fails to surface such a discussion. Had Mrs. Greenfield, who is presently a JCCA employee, been called to testify she could have stated when, and with whom this crucial discussion had taken place.
There could have been a particularization of its substance, and an explanation of why no notation of its occurrence appeared in the case record.
The respondent’s case likewise eschewed live witnesses. In their stead respondent’s counsel introduced, on consent, the transcript of the previous trial.
Respondent’s counsel probed the question of JCCA’s diligent efforts to encourage and strengthen the parental relationship.
Respondent was queried whether any of the four or five caseworkers she had from 1972 until 1975 discussed with her any plan for the future of Suzanne. This was with respect to whether or not she would get Suzanne back for the purpose of making a home for her.
Her reply to that and several follow-up questions was sufficiently instructive to be quoted at length: "I was led to believe *222 that the baby was coming home, and that I was seeing her when they felt I was seeing her regularly, and that when they felt my psychiatrist said I could take Suzanne home, I would be allowed to take the baby home I was led to believe that at all times. * * * Terry suggested I go on welfare, and that’s the foster mother. Mrs. Ainsley did not do anything but kindly suggest that I should just give up Suzanne, and forget the whole thing.”
Mrs. Y. was also asked if any of the social workers or the caseworkers told you how you could get your baby back. She replied "They didn’t. They told me how I could sign her away, though”.
She amplified this by indicating that not one of the caseworkers even told her how to get the baby back.
She was also asked "Did they ever tell you what you must do in order not to lose the baby?” She replied "No”.
Notwithstanding this decidedly provocative testimony, counsel for JCCA reiterated her waiver of cross-examination of respondent.
As a result, respondent’s statements delineating the lack of encouragement and diligent efforts by JCCA were left unchallenged.
JCCA is fully capable of assisting a confused and antagonistic parent to develop a plan for her child’s future. One need only examine the evidence respecting respondent’s other child, Hime, presented at the very same hearing to appreciate how far short of its duty petitioner fell with respect to Suzanne.
The record reflects the commendable efforts spent assisting respondent in developing a plan for Hime’s future. Had petitioner been similarly inclined with respect to Suzanne, it knew how to do so.
The attitude of JCCA in this proceeding is similar to that criticized in Matter of Irene O. (38 NY2d 776, supra) where the agency’s negative assessment of the mother disposed it to refrain from expending its resources to strengthen the parental relationship.
The record makes clear that JCCA’s plan was to free Suzanne for adoption. In view of this, it is not surprising that it failed to exercise diligent efforts to promote the parental relationship. Accordingly, it must be found wanting in its duty. (Matter of Denlow, 87 Misc 2d 410.)
Although the point was not raised directly by counsel, the *223 court has considered whether JCCA failed to exercise diligent efforts because it felt that such efforts would be detrimental to the best interests of the child.
The case record is silent with respect to this consideration, and petitioner made no cogent effort to establish that respondent’s intransigence, instability and abusive conduct toward the child rendered encouragement of the parental relationship detrimental to the child’s best interests. (Matter of Ray A. M., 37 NY2d 619.) The mere fact that respondent’s situation made her difficult to assist does not excuse a lack of diligent efforts. (Matter of Anita "PP”, 65 AD2d 18, supra.)
This case, as presented, leads me to perceive respondent, an undoubtedly troubled person, as one whose nonconforming life-style made the agency less than zealous in offering her the services she needed.
It is apparent that Mrs. Y. was an extremely confused woman, motivated by her desire to do what was best for her child. Although she consistently visited Suzanne, attended therapy sessions and regularly maintained contact with the agency, she was unable to successfully fashion a plan for Suzanne’s future. Her confusion and frustration were enhanced by the agency’s failure to assist her with financial problems. The agency’s inability to deal with Mrs. Y.’s emotional problems does not obviate the necessity to achieve some sort of plan to unite mother and child.
The petitioner has failed to prove by a preponderance of the evidence that Mrs. -Y. failed to plan for the future of her child despite diligent efforts of the agency to encourage and strengthen the parental relationship.
Accordingly, the petition is hereby dismissed.
[Portions of opinion omitted for purposes of publication.]